NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0290n.06
Filed: April 27, 2006

No. 05-5431

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| MICHAEL KRAEMER, and KENNETH ROBERSON, ) ) ) **Plaintiffs-Appellants,** ) ) v. ) ) ) MARK LUTTRELL, SHERIFF OF ) SHELBY COUNTY, TENNESSEE, ) ) **Defendant-Appellee.** ) _____) | **ON APPEAL** FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE **O P I N I O N** |

**Before: MOORE, GRIFFIN, and CUDAHY,**[*] **Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** Plaintiffs-Appellants Michael Kraemer

("Kraemer") and Kenneth Roberson ("Roberson") (referred to collectively as "Appellants") appeal

the dismissal of their claims, pursuant to a motion for summary judgment, against Defendant-

Appellee Mark Luttrell ("Luttrell"), Sheriff of Shelby County, Tennessee ("the County"). Kraemer

charges that the County violated a memorandum of understanding ("MOU") and committed a

constitutional tort by transferring his work assignment in retaliation for filing a grievance regarding

uncompensated on-call time. Roberson claims that he was denied a promotion on the basis of his

race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e)-2.

---

[*]The Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit,
sitting by designation.

For the reasons set forth below, we **AFFIRM** the grant of Luttrell's motion for summary judgment on the Appellants' claims.

## I. BACKGROUND

### A. Facts Related to Kraemer

Since approximately 1995, Kraemer has been employed full time as a deputy sheriff for the Shelby County Sheriff's Department ("the Department"). Kraemer's current rank is patrolman, and he has been working for the uniform patrol division since November 2002. From 1998 until 2002, Kraemer worked for the special weapons and tactics ("SWAT") team. On October 7, 2002, Kraemer filed a grievance with the Department, pursuant to an MOU between the County and the Deputy Sheriffs' Association, with respect to on-call pay. The grievance was denied on October 18, 2002. On or about October 28, 2002, the Department notified Kraemer that he was being transferred from the SWAT team to the uniform patrol division on November 9, 2002. Kraemer believes that he was transferred in retaliation for filing the grievance.

### B. Facts Related to Roberson

For over ten years, Roberson, a black male, has been employed by the Department. He worked for the SWAT team from 1994 until 2004 with the exception of six months working for the uniform patrol division in 2000. In 2004, Roberson transferred to the gang unit and then to the narcotics unit. Since 1997, Roberson has held the rank of sergeant. In late 2000 or early 2001, Roberson participated in the Department's process to gain promotion to lieutenant. Twenty-eight officers successfully completed the eligibility process and became eligible for promotion; six (21%) of these officers were black. Of the twenty-eight officers who became eligible for promotion, only nine actually received promotions, which took effect October 16, 2001. Three (33.3%) of the nine

2

promoted officers were black. Of the six black eligible officers, three (50%) were promoted. Of the twenty-two non-black eligible officers, six (27%) were promoted.

## C. Procedural History

On April 25, 2003, the Appellants (along with two others who later abandoned the suit) filed a petition for writ of mandamus in Tennessee state court requesting that Luttrell give final answers to grievances that the Appellants had filed. The petition raised no federal claims. On June 19, 2003, the Appellants filed an amended petition for writ of mandamus and other relief, which alleged, inter alia, that the Department discriminated against Roberson on the basis of race in violation of Title VII. The case was then properly removed to the United States District Court for the Western District of Tennessee pursuant to 28 U.S.C. §§ 1441 and 1446. On August 6, 2004, the Appellants again amended their petition to allege a constitutional tort for retaliation in response to the filing of grievances. Luttrell moved for summary judgment on the claims of both Appellants, and the district court granted both motions in their entirety. Appellants filed this timely appeal.

## II. ANALYSIS

## A. Standard of Review

We conduct a de novo review of a grant of summary judgment. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, "we must view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *DiCarlo*, 358 F.3d at 414 (internal quotation marks omitted). We determine "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (internal quotation marks omitted).

## B. Kraemer's Retaliation Claim

### 1. Nature of the Claim

Kraemer fails to specify the theory under which his claim arises. He seems to argue that his transfer following the filing of the grievance constituted unlawful retaliation on two grounds: (1) that he had a right to file the grievance under the MOU, and (2) that he had a First Amendment right, U.S. Const. amend. I, to file the grievance complaining of certain conduct by the Department and that his transfer was a punishment for exercising that right.

Luttrell argues that Kraemer had no right to file a grievance under the MOU because municipalities cannot enter into enforceable collective bargaining agreements with their employees under Tennessee law.[2] In interpreting questions of state law, we, as a federal court, "must apply state law in accordance with the controlling decisions of the highest court of the state." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Where a state-law issue has not been resolved by the state's highest court, we must endeavor to determine how the state's highest court would resolve the issue. *Id.* In so doing, we "heed the decisions of the intermediate appellate state courts except where [we are] persuaded that the highest court of the state would not so decide." *Pack v. Damon Corp.*, 434 F.3d 810, 818 (6th Cir. 2006). We "may consider applicable dicta of the state's highest court" in our effort to ascertain how that court would decide the issue. *Id.*

---

[2]Kraemer made no argument and cited no authority to the contrary in his initial brief to this court and filed no reply brief to dispute Luttrell's position.

In 1957, the Tennessee Court of Appeals held that a municipality cannot enter into an enforceable collective bargaining agreement with its employees. *Weakley County Mun. Elec. Sys. v. Wick*, 309 S.W.2d 792, 802 (Tenn. Ct. App. 1957). Shortly after *Weakley* was decided, the Tennessee Supreme Court expressed that *Weakley* accurately reflected Tennessee's public policy. *Keeble v. City of Alcoa*, 319 S.W.2d 249, 251-52 (Tenn. 1958). A later opinion by the Tennessee Supreme Court acknowledged *Weakley*'s holding and noted that Tennessee had no general statutory provision authorizing municipalities to engage in collective bargaining with their employees. *Fulenwider v. Firefighters Ass'n Local Union 1784*, 649 S.W.2d 268, 270 (Tenn. 1982). A more recent unpublished opinion of the Tennessee Court of Appeals continued to follow *Weakley*. *Local Union 760 Int'l Bhd. of Elec. Workers v. City of Harriman*, No. E2000-00367-COA-R3-CV, 2000 WL 1801856, at *2-3 (Tenn. Ct. App. Dec. 8, 2000); *see also* 1 TENN. JURIS., LABOR, § 14 (2004).

Several authors have suggested that the statements in *Weakley*, *Keeble*, and *Fulenwider* regarding the enforceability of these contracts are dicta and have argued that such contracts should be enforceable, noting a trend toward permitting bargaining for municipal employees in other jurisdictions. *See* Patrick Hardin, *Regulation of Collective Bargaining in Public Employment in Tennessee: The Education Professional Negotiations Act*, 47 TENN. L. REV. 241, 241-45 (1980); Robert B. Moberly, *Public Sector Labor Relations Law in Tennessee: The Current Inadequacies and the Available Alternatives*, 42 TENN. L. REV. 235, 238-41 (1975). However, there has been no indication of a change in this policy as it applies to this case from the Tennessee courts or the legislature, the authorities we must follow in assessing how the Tennessee Supreme Court would

5

decide this question.[3] Moreover, we are authorized to consider the dicta of the Tennessee Supreme Court in determining how it would decide this matter. *See Pack*, 434 F.3d at 818. Given the latest pronouncements of the Tennessee Supreme Court and the Tennessee Court of Appeals, we must conclude that the Tennessee Supreme Court would continue to hold that contracts between municipalities and labor organizations are unenforceable under Tennessee law. Therefore, Kraemer had no independent rights arising under the MOU, and thus his retaliation claim is not sustainable under this theory.

As to the second ground, we read Kraemer's constitutional tort claim as being raised pursuant to 42 U.S.C. § 1983,[4] even though he fails to mention the statute, because: (1) the one case on which he relies involves a § 1983 claim, *see Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc); (2) his statement of the elements of the claim comports with the elements of the constitutional tort of retaliation, *see id.*; and (3) he discusses municipal liability, which would be relevant for a § 1983 constitutional claim.[5] Moreover, Kraemer's failure to mention § 1983 does not

---

[3]Although the Tennessee legislature passed two statutes in the 1970s authorizing municipalities to engage in collective bargaining with two specific types of workers, educational professionals, TENN. CODE ANN. § 49-5-601, and transit workers, TENN. CODE ANN. § 7-56-101, the Tennessee Court of Appeals held that these statutes had no effect on *Weakley*'s general bar on collective bargaining agreements between municipalities and their employees except as applied to those two classes of workers. *Local Union 760 Int'l Bhd. of Elec. Workers*, 2000 WL 1801856, at *3. That court further held that a Tennessee statute that requires labor negotiations between municipalities and public employee unions to be open to the public, TENN. CODE ANN. § 8-44-201, also applied only to the educational and transit workers specifically authorized to bargain by statute and had no broader impact on *Weakley*. *Local Union 760 Int'l Bhd. of Elec. Workers*, 2000 WL 1801856, at *3.

[4]The means by which to pursue redress for a constitutional violation by a state or municipal actor is 42 U.S.C. § 1983. *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 471 (6th Cir. 2006); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

[5]The district court also analyzed Kraemer's retaliation claim as a claim under Title VII. Regardless of whether Kraemer ever properly raised a Title VII retaliation claim, Kraemer has

appear to be an intentional strategy to circumvent the requirements of the statute. Therefore, we will assume he raised his claim under § 1983.

Kraemer never specifies whether he is suing Luttrell in his individual or official capacity. Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself, and thus a successful suit against a municipal officer in his official capacity must meet the requirements for municipal liability stated in *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690-91 (1978). *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (explaining that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent" and that "[b]ecause the real party in interest in an official-capacity suit [against a municipal officer] is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law" (internal quotation marks and citations omitted)); *see also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 8.6, at 515 (4th ed. 2003). Kraemer states that "to establish the County's lability for his injuries, there must either be an officially executed policy of the County, or the toleration of a custom within the Sheriff's department." Appellants' Br. at 11. Because he concedes that he must meet the *Monell* requirements to recover on his claim, we read Kraemer's suit to be against Luttrell in his official capacity, and thus, in effect, against the County.

---

forfeited any Title VII issue for review because he does not mention Title VII, does not discuss the elements of a Title VII retaliation claim, and cites no Title VII retaliation cases. Kraemer's concession that he must establish the requirements for municipal liability to recover on his claim also indicates that he is proceeding solely pursuant to § 1983 because Title VII does not require such a showing of municipal liability. *See Freeman v. Michigan, Dep't of State*, 808 F.2d 1174, 1178 (6th Cir. 1987). Kraemer has asserted no other statutory basis to support the notion that filing a grievance pursuant to the MOU is a protected activity.

## 2. Elements of the Constitutional Retaliation Claim

"It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X*, 175 F.3d at 386. We have explained that "certain provisions of the Constitution[, such as the First Amendment,] define individual rights with which the government generally cannot interfere — actions taken pursuant to those rights are 'protected' by the Constitution." *Id.* at 387. A First Amendment retaliation claim entails the following three elements: "'(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.'" *Dean v. Byerley*, 354 F.3d 540, 551 (6th Cir. 2004) (quoting *Thaddeus-X*, 175 F.3d at 394).

A public employee's private communication with his or her employer is protected by the First Amendment. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 413 (1979). Therefore, under certain circumstances, the filing of a grievance by a public employee could be considered a protected First Amendment activity. Whether the filing of a grievance is protected depends on the content of the grievance because public employees' speech is protected from retaliatory conduct primarily when the speech relates to a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 144-47 (1983); *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 678 (6th Cir. 2001). Whether the speech at issue is a matter of public concern is assessed by "'balanc[ing] . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its

8

employees.'" *Connick*, 461 U.S. at 140 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). The Supreme Court has previously held that questions on "office transfer policy, office morale, the need for a grievance committee, [and] the level of confidence in supervisors," in a questionnaire distributed by an employee were not matters of public concern. *Id.* at 141, 148. Like the questionnaire in *Connick*, Kraemer's grievance merely "reflect[s] one employee's dissatisfaction with [his employer's action,]" and, "if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." *Id.* at 148. Under the rationale of *Connick*, Kraemer's complaint regarding his uncompensated on-call time cannot be viewed as a matter of public concern, and thus his grievance cannot be considered a "protected activity" for the purposes of his constitutional retaliation claim. *Id.* Therefore, summary judgment was appropriately granted on this claim, and we need not address the other elements of the retaliation claim or the municipal liability requirements.

## C. Roberson's Race Discrimination Claim

Although the district court analyzed Roberson's claim under a disparate impact theory, Roberson's brief to this court alleges a claim of intentional discrimination based on circumstantial evidence. As Luttrell makes no objection to Roberson's reliance on a theory of intentional discrimination, we proceed to review Roberson's claim on this basis.

### 1. *McDonnell Douglas* Burden-Shifting Framework

Title VII claims brought under a theory of circumstantial evidence are analyzed under the familiar burden-shifting framework first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Under this framework, the employee must first establish a prima facie case.

9

*DiCarlo*, 358 F.3d at 414. If he succeeds, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *Id.* If the employer meets this burden, the employee must then demonstrate that the employer's proffered reason was a pretext for intentional discrimination in order to defeat summary judgment. *Id.* at 414-15.

## 2. Prima Facie Case

To state a prima facie case on a failure to promote claim, the plaintiff must show "(1) that he is a member of a protected class; (2) that he applied and was qualified for a promotion; (3) that he was considered for and denied the promotion; and (4) [that] other employees of similar qualifications who were not members of the protected class received promotions."[6] *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000)).

It is undisputed that Roberson has shown the first and third elements of the prima facie case. Luttrell correctly claims that Roberson has failed to show the second element of the prima facie case because Roberson sought only a general promotion to lieutenant, not to the head of the SWAT team, and even if promoted, was not guaranteed an assignment to lead the SWAT team.[7] Roberson's

---

[6]"[I]n *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 603 (6th Cir. 2002) and *Roh v. Lakeshore Estates, Inc.*, 241 F.3d 491, 497 (6th Cir. 2001), this Court stated that the fourth prong could be met if the position went to a less-qualified applicant who was not a member of the protected group." *Anthony v. BTR Automotive Sealing Sys., Inc.*, 339 F.3d 506, 515 n.10 (6th Cir. 2003). However, because "[t]his standard conflicts with or ignores prior published decisions of this Court using the 'similarly situated' standard," we have subsequently applied the "similarly situated" approach. *Id.* The fourth prong has also alternatively been phrased to require the plaintiff to show that the "employer treated differently employees who were similarly situated but not members of the protected group." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002) (internal quotation marks omitted).

[7]If the promotion claim is read in the narrow sense as a promotion to the head of the SWAT team, Roberson could make out the fourth element of the prima facie case because Dale Lane, a

complaint can be read generously as a more general claim for denial of promotion to lieutenant: Roberson applied and was qualified for a promotion to lieutenant, but was denied this promotion. However, reading his claim as one for a denial of promotion to lieutenant, we conclude that Roberson would fail on the fourth element of the prima facie case because three other members of the same protected class did receive promotions to lieutenant.[8] Therefore, Roberson has failed to set forth a prima facie case, and summary judgment was properly granted on his claim.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment below.

---

white officer, filled this position.

[8]The percentage of officers promoted who were black (33%) was higher than the percentage of black officers eligible for promotion (21%). Moreover, 50% of the eligible black officers were promoted, whereas 27% of the eligible non-black officers were promoted. These statistics are not conclusive evidence that the Department did not discriminate against Roberson, but absent other evidence to prove that the Department treated the non-black promoted officers differently, *Zambetti*, 314 F.3d at 255, Roberson cannot establish the fourth element of the prima facie case for a general failure to promote claim.