Joseph J. CARROLL, Plaintiff,

v.

CITY OF MOUNT VERNON, Ernest D. Davis, Individually and as Mayor of the City of Mount Vernon, and City of Mount Vernon Department of Fire, Defendants.

No. 07 CV 11577(CS).

United States District Court, S.D. New York.

April 26, 2010.

Andrew P. Fleming, Chiacchia & Flemming, LLP, Hamburg, NY, for Plaintiff.

Howard M. Miller, Jessica Christine Satriano, Bond, Schoeneck & King, PLLC, Garden City, NJ, for Defendants.

## MEMORANDUM DECISION AND ORDER

SEIBEL, District Judge.

Plaintiff Joseph J. Carroll filed an Amended Complaint in this action on May 21, 2008, against Defendants Ernest Davis [1] and the City of Mount Vernon (the "City").[2] The Amended Complaint alleges

---

1. Defendant Davis was the Mayor of Mount Vernon at the time of the events in question.

2. Plaintiff initially named Nicholas Cicchetti as a Defendant in the Amended Complaint, but the Parties entered a stipulation dismissing the action as against Defendant Cicchetti

on March 31, 2009. (Doc. 31.) Plaintiff has also named the City of Mount Vernon Department of Fire. The Court notes, however, that administrative arms of municipalities "do not have a legal identity separate and apart from the municipality, and cannot sue or be sued." *Warner v. Village of Goshen Police Dep't,* 256

discrimination under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*) and the Equal Protection Clause of the Fourteenth Amendment (42 U.S.C. § 1983). Before this Court are the Parties' cross-motions for summary judgment. (Docs. 39, 47.)

## I. *Background*

The following facts are undisputed. Plaintiff is a Caucasian male who has been employed as a firefighter with the City of Mount Vernon Fire Department since 1988. (Defendants' Rule 56.1 Statement ("Defs.' 56.1") ¶¶ 1, 2.) On March 27, 2004, he took and passed promotional Civil Service Examination No. 75–608 for Fire Lieutenant. (*Id.* ¶ 3.) The civil service list derived from the results of that examination (the "2004 List") became effective on July 19, 2004 and was to expire on July 19, 2006. (*Id.* ¶ 4; Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1") ¶ 2.) Plaintiff initially ranked 9th on the 2004 List. (Defs.' 56.1 ¶ 5.) In January 2006 the expiration date of the 2004 List was extended to July 19, 2007. (Pl.'s 56.1 ¶ 3; Defs.' 56.1 ¶ 7.) By January 2007, Plaintiff ranked third on the 2004 List, making him eligible to be selected for an appointment.[3] (Pl.'s 56.1 ¶ 5; Defs.' 56.1 ¶ 6.) On March 14, 2007, Plaintiff was interviewed for a vacant Fire Lieutenant position. (Defs.' 56.1 ¶ 8.) On March 16, 2007, the position for which Plaintiff had interviewed was given to Michael Brown, a Caucasian firefighter who had been ranked second on the 2004 List. (*Id.* ¶ 9; Pl.'s 56.1 Ex. A at 00079.)

By June 2007, two more Fire Lieutenant positions had become available. (Pl.'s 56.1 ¶ 7.) On July 3, 2007, Plaintiff was notified to appear at the Mayor's office on July 5, 2007 for an interview. (*Id.* ¶ 8.) Also on July 3, 2007, Curtis Bracy, President of the Vulcan Society,[4] wrote a letter to Mayor Davis objecting to filling these vacancies from the 2004 List. Bracy asserted that the extension of the 2004 List was invalid without permission from the Vulcan Society and that appointment from the 2004 List would be a violation of a federal Consent Decree.[5] (*Id.* Ex. B.) Mr. Bracy also expressed concern over the potential appointments because the 2004 List was about to expire and because one of the candidates for appointment (Officer Chase) had a close personal relationship with the newly appointed Civil Service Commissioner. (*Id.*) On July 4, Richard Hiller, counsel for the Vulcan Society, wrote a letter to Terence O'Neill, legal counsel for the City, reiterating that the Vulcan Society considered any promotions made from the 2004 List to be in violation of the Consent Decree, and that "if any such promotions are

F.Supp.2d 171, 175–76 (S.D.N.Y.2003). Therefore, the Court evaluates Plaintiff's claims against Defendants Davis and the City of Mount Vernon only.

3. New York Civil Service Law § 61–1 requires that promotions be made from one of the three top ranking individuals on a civil service list. N.Y. Civ. Serv. Law § 61–1.

4. The Vulcan Society is a fraternal organization whose purpose is to represent the interests of African–American firefighters. *See United States v. City of New York,* 683 F.Supp.2d 225, 234 n. 1 (E.D.N.Y.2010) ("The Vulcan Society is an organization of black firefighters first constituted in the 1940s in response to what was then quite blatant and open discrimination against firefighters of color." (internal quotation marks omitted)).

5. The federal Consent Decree appears to be a Consent Judgment reached in 1980 between the Vulcan Society and the City of Mount Vernon in which the City agreed, among other things, "to undertake in good faith to make promotions to the ranks of fire officers in the Defendant Fire Department[ ] so as to achieve the goal of a fire officer corps ... which reflects the proportion of Blacks among the firefighters of [the] Defendant Fire Department." (Pl.'s 56.1 Ex. E at 00026.)

made, the private plaintiffs will take any and all remedial steps, including application to the Court. . . ." (*Id.* Ex. C.) Plaintiff appeared at the Mayor's office for an interview on July 5, 2007 and encountered fifteen to twenty members of the Vulcan Society gathered to protest the appointment of any Caucasian candidates from the 2004 List. (*Id.* ¶ 12.) The Vulcan Society's objections were referred to the City's Law Department, "from which no final answer emerged until after a new Civil Service list . . . had gone into effect." (*Id.* Ex. A at 00072.)

The new civil service list (the "2007 List"), created from a 2007 examination, became effective on July 9, 2007, replacing the 2004 List. (*Id.* Ex. A at 00077; Defs.' Rule 56.1 ¶ 11.) Plaintiff ranked 16th on this list and was therefore ineligible for promotion once it became effective. (Defs.' Rule 56.1 ¶ 12; Pl.'s 56.1 Ex. A at 00085.) The June 2007 Lieutenant vacancies were eventually filled in December 2007 by the appointments of Joseph Dalo and Justin Chase, both of whom are Caucasian. (Defs.' Rule 56.1 ¶¶ 13–15.) Kenneth Grant, an African–American who originally ranked fourth on the 2007 List, was promoted to Lieutenant in February 2008 after another position became vacant. (*Id.* ¶ 16; Pl.'s 56.1 Ex. A at 00084.)

One fact is disputed. Plaintiff asserts that the Mayor's Chief of Staff informed Plaintiff, at an unspecified time, that although everything "looked good" for Plaintiff's promotion, he would not be promoted because the Vulcan Society had challenged and opposed the promotion of a Caucasian candidate. (Pl.'s 56.1 ¶ 13.) Defendants dispute the truth of this assertion. (Defs.' 56.1 Counter–Statement ¶ 13.) For the purposes of this motion, the Court assumes that everything did "look good" for Plaintiff's promotion and that the Vulcan Society's opposition impeded the process.

The Court notes, however, that everything "look[ing] good" for Plaintiff's promotion is not the same as a guarantee of Plaintiff's promotion.

Plaintiff claims that Defendants improperly considered his race in denying him the promotion for which he was eligible. (Plaintiff's Memorandum of Law in Support of Summary Judgment ("Pl.'s Mem.") at 4.)

## II. *Analysis*

### A. *Summary Judgment Standard*

Summary judgment is warranted when the moving party shows that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). "A dispute about a genuine issue exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (internal quotation marks omitted). Accordingly, the trial court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir.2001). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the non-moving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). These standards apply in the Title VII context. *See Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases . . . the salutary pur-

poses of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation." (internal quotation marks omitted)).

Having "resolve[d] all ambiguities, and credit[ed] all factual inferences" in Plaintiff's favor, the Court finds that Plaintiff's Title VII and Equal Protection claims fail as a matter of law, and Defendants' cross-motion for summary judgment is granted.

### B. Title VII Claim

"To establish a *prima facie* case of a discriminatory failure to promote, a Title VII plaintiff must ordinarily demonstrate that: (1)[he] is a member of a protected class; (2)[he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."

*Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir.2009) (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir.2004)). "[F]or the plaintiff to

avoid an adverse judgment, there must be proof that the plaintiff was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.* (internal quotation marks omitted).

The Parties do not appear to dispute that Plaintiff is a member of a protected class. *See id.* ("There is no dispute that Aulicino [a white male] is a member of a protected class, i.e., a 'race' or 'color' ....").[6] Nor do the Parties dispute that Plaintiff was qualified for the promotion, that he was rejected for the position, or that the position remained open while the City continued to seek other applicants.[7]

■ The only disputed issue in Plaintiff's failure to promote claim is whether the circumstances "give rise to an inference of unlawful discrimination." Plaintiff claims that Defendants' refusal to follow through with his promotion constituted "race-based action." (Pl.'s Mem. at 6.) Specifically, Plaintiff argues that Defendants did not promote Plaintiff in order to "appease and acquiesce in the protests of and objections by the Vulcans ... who

**6.** In a footnote, the Court in *Aulicino* explained that it would not decide whether a "Title VII plaintiff who alleges discrimination on the basis that he is white ... must proffer evidence of 'background circumstances' reflecting that defendant is 'that unusual employer who discriminates against the majority.'" *Id.* at 80 n. 5 (comparing *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir.1981) (requiring such a showing), with *Iadimarco v. Runyon*, 190 F.3d 151, 160 (3d Cir.1999) (rejecting 'background circumstances' requirement)). As is the case here, the defendants in Aulicino did not argue that the plaintiff was obligated to proffer such evidence, so the Second Circuit did not see the need to decide the issue. *Id.* Nevertheless, courts in this District have found that white plaintiffs are not held to a higher pleading standard in Title VII cases. *See Pesok v. Hebrew Union Coll.-Jewish Inst. of Religion*, 235 F.Supp.2d 281, 286 (S.D.N.Y.2002);

*Tappe v. Alliance Capital Mgmt.*, 177 F.Supp.2d 176, 181–83 (S.D.N.Y.2001).

**7.** It is possible to argue that Plaintiff in this case was not rejected; he simply became ineligible a few days after his interview when the 2004 List expired. Furthermore, as Defendants note, the officials with whom Plaintiff interviewed were not even authorized to execute his promotion. The Fire Commissioner has the exclusive power to fill all vacancies. (*See* Pl.'s 56.1 Ex. A at 00073.) One could argue that since the Fire Commissioner had not formally requested that the position be filled, Plaintiff could not have been "rejected" (i.e., denied the promotion) within the meaning of the law. But because Defendants do not dispute that Plaintiff was rejected, and because, as noted below, the Supreme Court does not appear to view this factor as determinative, the Court does not reach this issue.

objected to the promotion because the candidates ... were white...." (*Id.* at 6–7.) Defendants argue that the promotional decision was not race-based. (Defs.' Reply Memorandum ("Reply") at 7 ("the City's promotional decisions were not based on race").)[8]

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e–2(a). The most common form of Title VII discrimination is "disparate treatment"—"where an employer has 'treated [a] particular person less favorably than others because of' a protected trait." *Ricci*, 129 S.Ct. at 2672 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985–86, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)). That is the type of discrimination alleged here. "A disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-relat-

ed action." *Id.* (quoting *Watson*, 487 U.S. at 986, 108 S.Ct. 2777).

Plaintiff has not satisfied his burden of showing that, in failing to promote him, the Defendants had "discriminatory intent or motive." The evidence presented shows that Plaintiff was scheduled for an interview with the Mayor's office on July 5, 2007. Before the interview, representatives of the Vulcan Society wrote two letters (one to the Mayor and one to counsel for the City) objecting to the promotions of Plaintiff and another firefighter named Chase. The Vulcan Society's grounds for objection were that: (1) the extension of the expiration of the 2004 List without the consent of the Vulcan Society was a violation of the federal Consent Decree; (2) Chase's promotion appeared to be the result of nepotism; (3) the Fire Chief and Fire Commissioner had assured the Vulcan Society that no further promotions would be made from the 2004 List; and (4) the Lieutenants rank did not reflect the working population of the community, and rushing to promote the Plaintiff and Offi-

---

**8.** Defendants' main argument is that Plaintiff cannot prove a prima facie case for failure to promote where the position was eventually filled by a person of the same race. (Defs.' Memorandum in Opp'n ("Defs.' Opp'n") at 6.) Defendants cite a number of opinions which hold that a plaintiff fails to state a prima facie case of intentional racial discrimination where the position plaintiff sought was filled by another individual of the same race as plaintiff. (Reply at 1–2 (citing *Kraemer v. Luttrell*, 189 Fed.Appx. 361 (6th Cir.2006)); *Scott v. Potter*, 134 Fed.Appx. 989 (8th Cir. 2005); *Constance v. Pepsi Bottling Co.*, No. 03–CV–5009, 2007 WL 2460688, at *20 (E.D.N.Y. Aug. 24, 2007); *Johnson v. State of Conn. Dep't of Corrections*, 392 F.Supp.2d 326, 338 (D.Conn.2005); *Pointer v. Columbia Univ.*, No. 95–CV–8418, 1998 WL 898313, at *5 (S.D.N.Y. Dec. 22, 1998); *Harmon v. Runyon*, No. 96–CV–6080, 1997 WL 786383, at *5 (S.D.N.Y. Dec. 19, 1997).)
In this case, the position for which Plaintiff was eligible was eventually filled by Cauca-

sians. Although this is usually a sufficient ground to dismiss an action for employment discrimination under Title VII, none of the cited cases involve a situation in which the defendant's discretion is circumscribed by a promotion list limiting the defendant to three choices. In other words, choosing to fill a position with a person of the same protected class as the plaintiff does not necessarily negate an inference of discriminatory intent where the employer's discretion is limited to three people, at least in a case such as this, where there is no evidence that the three included any individuals not of Plaintiff's race. Also, in light of the Supreme Court's decision in *Ricci v. DeStefano*, — U.S. —, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009), it appears that the dispositive question may be whether the decision not to promote was race-based, regardless of who was eventually awarded the position. Therefore, I will not dismiss the case on this ground alone.

cer Chase would violate the Consent Decree.[9] (Pl.'s 56.1 Exs. B, C.) The City, concerned about whether the promotions would violate the Consent Decree, referred the matter to the City's Law Department, and did not receive an answer until after the 2007 List had gone into effect, making Plaintiff ineligible for promotion and mooting the issue. (Pl.'s 56.1 Ex. A at 00072.) There is no evidence of discriminatory animus.

To the contrary, it appears that every appointment made in 2007 was of a Caucasian firefighter. In March 2007 a vacancy, for which Plaintiff was eligible, was filled by Michael Brown, a Caucasian. (Defs.' 56.1 ¶ 9; Affidavit of Rita Roque, Sept. 25, 2009 ("Roque Aff."), Ex. A.) In December 2007 two more vacancies were filled (from the 2007 List) by Caucasians. (Defs.' 56.1 ¶¶ 13–15; Roque Aff. Exs. B, C.) Plaintiff's argument that Defendants were stalling until the new list was in place in order to hire an African–American is undermined by the fact that they waited five months after the 2007 List became effective to fill those two vacancies and the fact that Kenneth Grant, an African–American, was eligible for the second of those two positions but was not awarded the position. (Roque Aff. Ex. D; Pl.'s 56.1 Ex. A at 00084; Reply at 6.) That the vacancies for which Plaintiff was eligible were ultimately filled by persons of the same race is not dispositive, *see supra* note 6, but it is a factor the Court may consider in determining whether the circumstances give rise to an inference of discrimination.

At most, the evidence shows the Defendants took time to consider the Vulcan Society's objection that the promotion would violate the twenty-seven-year-old Consent Decree. Plaintiff argues that this delay is impermissible because it was prompted by arguably "race-based" objections. In support of this argument, Plaintiff relies heavily on the Supreme Court's recent decision in *Ricci*. This case, however, is different from *Ricci*.

The plaintiffs in *Ricci* were seventeen white firefighters and one Hispanic firefighter in the City of New Haven who had taken and passed a promotional examination. *Ricci*, 129 S.Ct. at 2671. The results of the exam showed significant racial disparities in the passing rates. *Id.* at 2666. The City of New Haven Civil Service Board refused to certify the exam out of fear that it would face disparate-impact liability because the exam made too few minorities eligible for promotion. *Id.* at 2666, 2671. As a result of the Board's refusal to certify the exam, the plaintiffs were denied a chance at promotion. *Id.* at 2671. The Court found that "[a]ll the evidence demonstrates that the City chose not to certify the examination results because of the statistical disparity based on race...." *Id.* at 2673. "Without some other justification, this express, race-based decisionmaking violated Title VII's command that employers cannot take adverse employment actions because of an individual's race." *Id.* The real issue before the Court, however, was whether such a race-based employment action was permitted when it was taken in a good faith effort to avoid disparate-impact liability. The Court held that "under Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it

---

**9.** On July 9, 2007 (the day the 2004 List expired), the Vulcan Society withdrew its first objection, conceding that the City had the authority to extend the 2004 List without the consent of the Vulcan Society. (Pl.'s 56.1 Ex. D.)

fails to take the race-conscious, discriminatory action." *Id.* at 2677.

Plaintiff likens Defendants' failure to promote him to the City of New Haven Civil Service Board's refusal to certify the promotional examination. But the analogy is flawed. The Defendants in this case were not trying to avoid disparate-impact liability when they held up Plaintiff's potential promotion. They were presumably trying to determine whether the promotion would violate the Consent Decree. Therefore, if *Ricci* is read narrowly to apply only where an employer acts to avoid disparate-impact liability, it is not controlling in this case. Even if I were to read *Ricci* broadly to mean that an employer cannot take "race-based" action in an effort to avoid *any* sort of liability, *Ricci* is distinguishable.

In *Ricci,* the Civil Service Board took almost two months to decide whether to certify the promotional examination. *See Ricci,* 129 S.Ct. at 2667–71. It held several meetings at which extensive evidence was heard on whether the test violated the disparate-impact provisions of Title VII. *Id.* At the final meeting, the Board voted on whether to certify the exam. *Id.* at 2671. "[T]he [Board] deadlocked 2 to 2, resulting in a decision not to certify the results." *Id.* After months of deliberation, the Board had come to a final decision—a decision that deprived several white firefighters of a chance at promotion. *Id.* It was this decision that the Supreme Court deemed impermissible race-based action. *Id.* at 2673.

In this case, Defendants did not take any affirmative steps to deny Plaintiff an opportunity to be promoted. Plaintiff was brought in for an interview with the Mayor's Office—an office that appears to have influence but not the authority to promote him—four days before the expiration of the List that made Plaintiff eligible for

promotion. Upon learning of the Vulcan Society's objections, the City took no action while the City's Law Department evaluated the validity of the Vulcan Society's objections. Before the Law Department responded, the 2004 List expired, and Plaintiff became ineligible for the position. There is no evidence that the delay occasioned by consideration of the Vulcan Society's objections was a pretext for discrimination against whites. Furthermore, there is no evidence that the Law Department intentionally delayed its analysis in order to discriminate against whites. Plaintiff's opportunity simply evaporated while the Vulcan Society's objections were under consideration. This is a far cry from the City of New Haven's "express, race-based" decision.

Indeed, *Ricci* itself indicates that a municipality *can* treat an employee disparately where it has "a strong basis in evidence to believe" it will be subject to liability absent the race-conscious action. 129 S.Ct. at 2677. By definition, then, a municipality must have the opportunity to analyze the evidence to determine the strength of its potential liability. *See id.* at 2678 (employer "compelled to take a hard look" to determine if action would result in liability); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–18, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (Title VII sanctions intended to cause employers "to self-examine and to self-evaluate their employment practices") (internal quotation marks omitted). In *Ricci,* it was the Civil Service Board's decision not to certify the test results (in the absence of a strong basis in evidence to believe it would be liable)—not its consideration of the issue, or the delay occasioned thereby—that violated Title VII. *See id.* at 2674. Plaintiff here cannot establish Title VII liability simply because the promotion process was held up while the Law Department consid-

ered whether his promotion would violate the Consent Decree. The operative event that made Plaintiff ineligible for promotion was the expiration of the 2004 List on July 9, 2007—an event that was not race-based, and was out of Defendants' control. While the Defendants' passive conduct here may have resulted in the same effect as New Haven's in *Ricci* because of the passage of time, and while the Court does not minimize the impact on Plaintiff and completely understands his frustration, it cannot be said that the Defendants "made [an] employment decision because of race," *id.* at 2674, when all they decided was to do nothing for the moment.

Plaintiff argues that "a defendant's acquiescence to racially motivated protest or objections constitutes racial discrimination within the meaning of Title VII." (Pl.'s Mem. at 7.) The cases Plaintiff cites in support of this proposition, however, are all cases brought under the Fair Housing Act and stand for a much narrower proposition: that a municipal body may be charged with discrimination if it acquiesces in the opposition of private citizens it knows were motivated by a desire to keep minorities from moving into their communities. *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1221–22 (2d Cir. 1987) (city charged with discriminatory intent where capitulated to race-based public opposition to affordable housing); *The*

*Anderson Group, LLC v. City of Saratoga Springs*, 557 F.Supp.2d 332, 341, 346 (N.D.N.Y.2008) (same); *United States v. City of Birmingham*, 538 F.Supp. 819, 830 (E.D.Mich.1982) (same). These cases do not hold that a municipal body "discriminates" (for Title VII purposes) when it considers objections by private citizens seeking to ensure that their protected class is adequately represented or that the municipality adheres to its legal obligations.[10]

Rather, it was prudent for Defendants to determine if the Vulcan Society's opposition was well-founded: (1) whether the Decree actually forbade the City from extending the life span of the list without the Vulcan Society's consent; and (2) whether a "midnight appointment" on the eve of the expiration of the 2004 List might in fact violate its obligation to use its best efforts to maintain parity between the officer and firefighter ranks. The main objection—that promoting another white firefighter would exacerbate racial disparities between the officer and firefighter ranks in violation of the Consent Decree—was not frivolous or invalid on its face.[11] If the Court were to find that defendants cannot take time to consider potentially valid objections merely because they relate to the representation of racial minorities, it would not only discourage compliance with court-sanctioned efforts at achieving diversity

---

**10.** Plaintiff argues "[t]he situation here is no different than [in *City of Yonkers, City of Birmingham,* and *The Anderson Group*] .... Just as in *City of Birmingham,* the Defendants here are chargeable with racially discriminatory intent...." (Pl.'s Mem. at 10.) Plaintiff's attempt to compare the "racially discriminatory intent" displayed in *City of Birmingham*— where the object was to keep blacks out of the City—to the Vulcan Society's efforts to promote the interests of a historically underrepresented minority and to hold Defendants to the legal obligations the City undertook in prior litigation vastly overstates the case. Consideration of whether a proposed action

violates legal obligations is not analogous to acquiescence to bigotry.

**11.** Had Defendants ultimately decided not to promote Plaintiff in order to avoid litigation regarding the Consent Decree, that would have been unlawful under *Ricci* absent a strong basis in evidence that the City would lose in that litigation. But no such decision was reached here, and I do not read *Ricci* as requiring a strong basis in evidence before a municipality may even consider objections to its promotions.

and equal opportunity, such as the Consent Decree, but it would also discourage the voluntary compliance that is "the preferred means of achieving the objectives of Title VII." *Local No. 93, Int'l Ass'n of Firefighters AFL–CIO C.L.C. v. City of Cleveland,* 478 U.S. 501, 515, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986); *see Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) ("Cooperation and voluntary compliance" are preferred means for achieving goals of Title VII).[12] Employers should be permitted to "self-evaluate," *Moody,* 422 U.S. at 417–18, 95 S.Ct. 2362, and take that "hard look," *Ricci,* 129 S.Ct. at 2678, without fear that doing so would itself violate Title VII.

In light of the above, Plaintiff has not shown that the circumstances give rise to an inference of racial discrimination. Therefore, his Title VII claim fails as a matter of law.

### C. Equal Protection

■ Discrimination claims brought under the Equal Protection Clause are analyzed under the same standard as discrimination claims under Title VII. *See Feingold v. New York,* 366 F.3d 138, 159 (2d Cir.2004) ("The elements of one are generally the same as the elements of the other and the two must stand or fall together."); *Tilghman v. Waterbury Bd. of Educ.,* 154 Fed.Appx. 221, 223 (2d Cir. 2005) ("[T]he core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause."). To succeed on an Equal Protection claim, as under Title VII, Plaintiff must show "that the defendant acted with intent to discriminate." *United States v. Yonkers Bd. of Educ.,* 837 F.2d at 1216; *Jemmott v. Coughlin,* 85 F.3d 61, 68 (2d Cir.1996) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). For the reasons articulated above, Plaintiff has not shown that he was denied a promotion because of intentional racial discrimination. Therefore, his claim under the Equal Protection Clause of the Fourteenth Amendment fails as well.

■ Alternatively, Plaintiff's Equal Protection Claim fails against the City of Mount Vernon because he has presented no evidence showing the existence of an official policy or custom. A municipality may be held liable under Section 1983 "only when a constitutional deprivation is inflicted pursuant to its policy or custom." *Tatum v. City of New York,* No. 06–4290, 2009 WL 124881, at *8 (S.D.N.Y. Jan. 20, 2009) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). In this case, there is no evidence that the City engaged in a policy or custom of discrimination. Plaintiff points only to one incident that allegedly involved discrimination. This one incident cannot be construed as a "policy or custom" of the City.

Plaintiff correctly points out that "a single discrete act can constitute policy, sufficient to hold the municipality liable ... when it is performed by an official who has 'final' authority." (Plaintiff's Memorandum in Further Support at 8 (citing *Krulik v. Bd. of Educ.,* 781 F.2d 15, 23 (2d Cir. 1986)).) This principal, however, only applies where "a deliberate choice to follow a course of action is made from among vari-

---

**12.** While permitting such consideration might allow employers to say they are "considering" objections when they are really delaying a promotion in bad faith, there is no evidence of such bad faith in this case. But a Title VII plaintiff who could show such pretext could prevail.

ous alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). First, Plaintiff has not shown who was actually "responsible for establishing final policy" with respect to hiring decisions in the fire department. It is not clear whether the Mayor or the Fire Commissioner had the final say in hiring decisions, although it appears that it was the Fire Commissioner. Second, Plaintiff has not established who made the decision to take the time to consider the Vulcan Society's objections. Third, even if I were to assume that a final policymaking official was responsible for holding up Plaintiff's potential promotion, the conduct attributable to Defendants in this case—referring the matter to the City's Law Department—hardly constitutes "a deliberate choice to follow a course of action" to deny Plaintiff a promotion. Defendants cannot be said to have made a deliberate policy decision when the possible actions were still under review. Therefore, Plaintiff has not shown that Defendants had a "policy or custom" that deprived him of his constitutional rights.

■ Plaintiff's Equal Protection Claim against Defendant Davis also fails because Defendant Davis is entitled to qualified immunity. A government official sued in his individual capacity [13] is entitled to qualified immunity: "(1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable ... in light of the legal rules that were clearly established at the time it was taken." *Munafo v. Metro. Transp. Auth.,* 285 F.3d 201, 210 (2d Cir.2002) (internal citations and quotation marks omitted); *see Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action ... assessed in light of the legal rules that were clearly established at the time it was taken." (internal citations and quotation marks omitted)).

■ Even assuming (contrary to the findings above) that holding up Plaintiff's potential promotion in order to consider the Vulcan Society's objections did violate his constitutional rights and that Mayor Davis was the person responsible for such conduct, Defendant Davis's action was objectively reasonable "in light of the legal rules that were clearly established at the time it was taken." *Munafo,* 285 F.3d at 210. While it was clearly established law that treating someone differently because of his race violates the Equal Protection Clause, *see Jemmott,* 85 F.3d at 68, it was not clearly established in 2007 that holding up a potential promotion in a good faith effort to ensure compliance with a race-conscious Consent Decree is a constitutional violation as well. Even if I misread

**13.** Plaintiff correctly points out that Defendant Davis has also been sued in his "official capacity," and that qualified immunity does not apply to Defendants sued in their "official capacity." (Pl.'s Mem. in Further Support at 9 (citing *Frank v. Relin,* 1 F.3d 1317, 1327 (2d Cir.1993)).) But suing an individual in his official capacity is "only another way of pleading an action against an entity of which [the official] is an agent." *Brandon v. Holt,* 469 U.S. 464, 472–73 & n. 21, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Therefore, while Defendant Davis may not be entitled to qualified immunity in his official capacity, the claims against him in this capacity fail for the same reasons as the claims against the City.

*Ricci* and it in fact requires a finding that the Defendants have acted unconstitutionally, it cannot in my view be said that it "clearly" requires such a finding, and in any event it was not decided until 2009. It was objectively reasonable for Defendant Davis to believe that trying to ensure that the City did not violate obligations under the Consent Decree would not subject him to liability, and the contrary was certainly not clearly established.

### III. *Conclusion*

For the reasons stated above, Defendant's Cross–Motion for Summary Judgement is granted and Plaintiff's Motion for Summary Judgement is denied. The Clerk of Court is respectfully requested to terminate the pending motions, (Docs. 39, 47), and close the case.

**SO ORDERED.**