14-2270-cv (L)
*Village of Freeport v. Barrella*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2015

Nos. 14-2270-cv (L), 14-2349-cv (CON), 14-4287-cv (CON),
14-4324-cv (CON), 14-3615-cv (XAP)

VILLAGE OF FREEPORT AND ANDREW HARDWICK, AS MAYOR AND IN
HIS INDIVIDUAL CAPACITY,
*Defendants-Appellants-Cross-Appellees*,

v.

CHRISTOPHER BARRELLA,
*Plaintiff-Appellee-Cross-Appellant.*[*]

On Appeal from the United States District Court
for the Eastern District of New York

ARGUED: DECEMBER 9, 2015
DECIDED: FEBRUARY 16, 2016

---

[*] The Clerk of Court is directed to amend the official caption to conform to the caption above.

Before: LEVAL, CABRANES, and LOHIER, *Circuit Judges*.

――――――

This case asks us to resolve a vexed and recurring question: what does it mean to be Hispanic? Specifically, it presents the question of whether "Hispanic" describes a race for purposes of § 1981 and Title VII.

Defendants the Village of Freeport, NY ("Freeport" or "the Village") and its former mayor, Andrew Hardwick ("Hardwick"), appeal from a judgment of the United States District Court for the Eastern District of New York (Arthur D. Spatt, *Judge*) following a jury verdict for plaintiff Christopher Barrella ("Barrella"). Barrella had sued under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, alleging that Hardwick had not appointed him chief of police because Barrella was a white Italian-American, and that Hardwick had instead appointed a less-qualified Hispanic.

Based on longstanding Supreme Court and Second Circuit precedent, we reiterate that "race" includes ethnicity for purposes of § 1981, so that discrimination based on Hispanic ancestry or lack thereof constitutes racial discrimination under that statute. We also hold that "race" should be defined the same way for purposes of Title VII. Accordingly, we reject defendants' argument that an employer who promotes a white Hispanic candidate over a white non-Hispanic candidate cannot have engaged in racial

2

discrimination, and we **AFFIRM** the judgment of the District Court insofar as it denied defendants' motions for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.

We also hold that the District Court erred in permitting lay opinion testimony that speculated as to Hardwick's reasons for not appointing Barrella, in violation of Rule 701(b) of the Federal Rules of Evidence. Because this case was factually close, we conclude that the District Court's error was not harmless. We therefore **VACATE** the judgment of the District Court and **REMAND** for a new trial consistent with this opinion.

———

KEITH M. CORBETT, Harris Beach PLLC, Uniondale, NY, *for Defendant-Appellant-Cross-Appellee Village of Freeport*.

KENNETH A. NOVIKOFF (Evan H. Krinick, Cheryl F. Korman, Scott R. Green, *on the brief*), Rivkin Radler LLP, Uniondale, NY, *for Defendant-Appellant-Cross-Appellee Andrew Hardwick*.

AMANDA M. FUGAZY (Adam C. Weiss, Paul P. Rooney, *on the brief*), Ellenoff Grossman & Schole LLP, New York, NY, *for Plaintiff-Appellee-Cross-Appellant Christopher Barrella*.

———

JOSÉ A. CABRANES, *Circuit Judge*:

This case asks us to resolve a vexed and recurring question: what does it mean to be Hispanic? Specifically, it presents the question of whether "Hispanic" describes a race for purposes of § 1981 and Title VII.

Defendants the Village of Freeport, NY ("Freeport" or "the Village") and its former mayor, Andrew Hardwick ("Hardwick"), appeal from a judgment of the United States District Court for the Eastern District of New York (Arthur D. Spatt, *Judge*) following a jury verdict for plaintiff Christopher Barrella ("Barrella"). Barrella had sued under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, alleging that Hardwick had not appointed him chief of police because Barrella was a white Italian-American, and that Hardwick had instead appointed a less-qualified Hispanic.

Based on longstanding Supreme Court and Second Circuit precedent, we reiterate that "race" includes ethnicity for purposes of § 1981, so that discrimination based on Hispanic ancestry or lack thereof constitutes racial discrimination under that statute. We also hold that "race" should be defined the same way for purposes of Title VII. Accordingly, we reject defendants' argument that an employer who promotes a white Hispanic candidate over a white non-Hispanic candidate cannot have engaged in racial

4

discrimination, and we **AFFIRM** the judgment of the District Court insofar as it denied defendants' motions for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.

We also hold that the District Court erred in permitting lay opinion testimony that speculated as to Hardwick's reasons for not appointing Barrella, in violation of Rule 701(b) of the Federal Rules of Evidence. Because this case was factually close, we conclude that the District Court's error was not harmless. We therefore **VACATE** the judgment of the District Court and **REMAND** for a new trial consistent with this opinion.

## I. BACKGROUND[1]

In 2009, the Village elected its first black mayor, Andrew Hardwick. Once in office, Hardwick sought to replace the Freeport Police Department's all-white "command staff"—its chief, assistant chief, and deputy chief—with officers who "shared his vision for Freeport"[2] and would help him "achieve his vision of community unity."[3]

---

[1] Because this appeal follows a jury verdict, we view the facts in the light most favorable to the prevailing party, namely, Barrella. *See Altria Grp., Inc. v. United States*, 658 F.3d 276, 279 (2d Cir. 2011).

[2] Hardwick Br. 6.

[3] Village Br. 7. Defendants also contend that Hardwick believed that the salaries and benefits of the existing command staff had become fiscally unsustainable. J.A. 2269. (References to "J.A." are to the joint appendix.)

Hardwick quickly identified Lieutenant Miguel Bermudez ("Bermudez") as his preferred candidate for the command staff and, ultimately, for chief of police. Bermudez—"who identifies as a member of the White race" and was born in Cuba[4]—had grown up in Freeport and, after living for some time in nearby Massapequa Park, had moved back to the Village in 2006. Bermudez and Hardwick had known each other for more than 25 years,[5] primarily through their shared service in the Freeport Fire Department.

Filling the positions of deputy chief and assistant chief required approval by the Village Board of Trustees, of which the mayor was a member. In April 2010, Hardwick recommended to the Trustees that Bermudez be named deputy chief (the most junior of the three command staff positions), and the Trustees unanimously approved his appointment. Three months later, the mayor recommended, and the Board confirmed, Bermudez's promotion to assistant chief. That promotion made Bermudez the *de facto* chief of police because the nominal chief, Michael Woodward, was often absent from Freeport, as he used up his accrued leave in preparation for his pending retirement.

---

[4] Hardwick Br. 2.

[5] The precise duration of their relationship is unclear. Hardwick testified that he had known Bermudez for "[o]ver 40 years." J.A. 3208. Hardwick's counsel told the jury that the number was 30 or 35 years, *Barrella v. Vill. of Freeport*, 43 F. Supp. 3d 136, 148 (E.D.N.Y. 2014), but now states that "Hardwick and Bermudez had known each other for over twenty-five (25) years at the time he was elected Mayor," Hardwick Br. 7.

Unlike the positions of deputy chief and assistant chief, the Freeport Chief of Police is a civil service position for which candidates must take a promotional examination. The three highest scorers are eligible for selection by the mayor, who exercises sole control over the appointment.

After the Village announced that it would be appointing a new chief, six Freeport police lieutenants sat for a promotional examination, in March 2010. Plaintiff Christopher Barrella, a white Italian-American born in the United States, scored highest. Lieutenant Wayne Giglio, also white, earned the second-highest score. Bermudez came in third.

Barrella testified that he considered himself more qualified than Bermudez to serve as chief. Unlike Bermudez, who had not completed college, Barrella had earned a master's degree in criminal justice and a law degree. Barrella also had more "time in rank" as a lieutenant than Bermudez. And Barrella out-scored Bermudez on the promotional examination. At the same time, Barrella faced three obstacles: he did not know Hardwick; he lacked any influential political allies; and he was not, and never had been, a Freeport resident. The parties dispute the relevance of these considerations.

In November 2010, Hardwick promoted Bermudez to chief without interviewing Barrella or reviewing his resume, personnel file, or other materials related to his candidacy for the position.[6]

In August 2011, Barrella filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that he had not been promoted because of his race (non-Hispanic white) and national origin (American). After the EEOC sent Barrella a "Notice of Right to Sue," he commenced this action on January 25, 2012, against Hardwick[7] and the Village, alleging violations of 42 U.S.C. §§ 1981 and 1983,[8] Title VII, and NYSHRL.

---

[6] Nor did Hardwick thoroughly review Bermudez's personnel records. For instance, before making his decision, Hardwick did not bother to learn whether Bermudez had obtained a college degree.

[7] Barrella sued Hardwick in his official and individual capacities. At the end of the trial, the District Court "implicitly dismissed any claims against Hardwick in his official capacity" as merely duplicating the suit against the Village. *Barrella*, 43 F. Supp. 3d at 172.

[8] Section 1983 provides in relevant part that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Because § 1983 does not confer any substantive rights, but "merely provides a method for vindicating federal rights elsewhere conferred," *Patterson v. Cty. of*

After extensive discovery, defendants filed motions for summary judgment. On April 26, 2014, the District Court denied the motions except with respect to Barrella's claim of national-origin discrimination. The case then proceeded to trial, during which the jury heard testimony from twelve witnesses over a period of three weeks. At the conclusion of the trial, and after five days of deliberation, the jury rendered a verdict against both defendants on May 28, 2014, finding that Hardwick had intentionally discriminated against Barrella on the basis of race. The jury awarded Barrella $150,000 for lost back pay, $1,000,000 for lost future pay, and (against Hardwick only) $200,000 in punitive damages. The District Court denied defendants' motions for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure and for a new trial or remittitur under Rule 59. The Court also awarded attorneys' fees and costs to Barrella, but denied his motion to augment his damages to offset the negative tax consequences of receiving his lost income as a lump sum. This appeal followed.

## II. DISCUSSION

### A. Is "Hispanic" a "Race"?

Defendants' principal argument is that "Hispanics" do not constitute a distinct "race" as a matter of law. As a result, defendants argue, Barrella and Bermudez are both white in the estimation of

_____

*Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (internal quotation marks omitted), we need not consider Barrella's § 1983 claims separately from his § 1981 claims.

federal antidiscrimination statutes, and Hardwick's decision to promote one white candidate rather than another could not have constituted racial discrimination.[9] Defendants raised this argument in

[9] We express no opinion as to whether it is accurate, as defendants insist, that "if Bermudez was of the same race as . . . Barrella, there can be, as a matter of law, no inference of racial discrimination." Hardwick Br. 54; *cf.* Village Br. 21 ("It is axiomatic[ ] that a Plaintiff attempting to establish [that] he is a member of a protected class . . . is required to demonstrate that he suffered racial discrimination as a result of an individual of a different race receiving a benefit to which the Plaintiff was denied."). Neither defendant cites a published appellate decision supporting this notion. Of course, the fact that an employer favored someone outside of the relevant protected class "will ordinarily suffice" to sustain an inference of discrimination. *See Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015). Conversely, a plaintiff who cannot show an employer's "preference for a person not of the [plaintiff's] protected class" will usually be unable to sustain a claim of disparate treatment. *See James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). But we have nonetheless suggested that a plaintiff may be able to plead a *prima facie* case under Title VII even without showing that the defendant favored someone outside of the plaintiff's protected class. *See Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 n.5 (2d Cir. 2009); *see also Fisher v. Vassar Coll.*, 70 F.3d 1420, 1448 (2d Cir. 1995) ("[F]avorable treatment of one member of a protected class does not rule out the possibility that another member of the same class suffered discrimination."), *reheard en banc on other grounds*, 114 F.3d 1332 (2d Cir. 1997), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

It would seem especially inappropriate to require such a showing in the instant case, "in which the [mayor's] discretion [was] circumscribed by a promotion list limiting [him] to three choices." *Carroll v. City of Mount Vernon*, 707 F. Supp. 2d 449, 454 n.8 (S.D.N.Y. 2010). If, as defendants maintain, Bermudez is white as a matter of law, then the results of the March 2010 promotional examination forced Hardwick to choose among three "white" candidates for chief: Barrella, Giglio, and Bermudez. Accordingly, Hardwick's ultimate decision to appoint a "white" chief in those circumstances would hardly prove the absence of discriminatory intent. *Cf. Ricci v. DeStefano*, 557 U.S. 557 (2009) (recognizing that white and Hispanic firefighters could bring a claim under Title VII after their

10

their motions for summary judgment, motions *in limine*, and at trial. They renew the same argument here in challenging the District Court's denial of their Rule 50 motions for judgment as a matter of law.[10]

In addressing this argument, we need not answer the vexed question posed by the Village's brief: "What is Race?"[11] We do, however, need to resolve a narrower issue: whether "Hispanic" is a "race" for purposes of § 1981 and Title VII.

---

municipal employer voided the results of their promotional examination due to race, even if the employer intended to offer a second promotional examination that might also have led to the promotion of white and Hispanic firefighters). Nonetheless, we need not address this argument, as we conclude below that Bermudez and Barrella belong to different races *for purposes of § 1981 and Title VII*.

[10] Defendants also raise this argument in challenging the District Court's denial of summary judgment. In general, we will not consider an appeal from a denial of summary judgment, which does not qualify as a "final decision" for purposes of 28 U.S.C. § 1291, *see Ortiz v. Jordan*, 562 U.S. 180, 188 (2011), and which is in any case unappealable following a trial on the merits, *id.* at 183-84. We have recognized an exception to this rule, however, "where the district court's error was purely one of law." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 201 n.2 (2d Cir. 2014) (internal quotation marks omitted). But that exception does not apply here, because defendants raise both legal and fact-based challenges to the denial of summary judgment. *See, e.g.*, Village Br. 20-23 (challenging the sufficiency of the evidence); *see also Stampf*, 761 F.3d at 201 n.2 (noting that purely legal questions do not "typically involve" disputes about "why an action was taken" (internal quotation marks omitted)). Moreover, to the extent that defendants' summary judgment arguments do raise pure questions of law, we fully consider them in the context of defendants' motions for judgment as a matter of law.

[11] Village Br. 4.

## 1. "Hispanic" in Common Usage

The parties and the District Court experienced some confusion in unraveling the legal definitions of "race" and "Hispanic," thanks partly to the federal government's less-than-straightforward use of those terms.[12] The Census Bureau, following standards issued by the Office of Management and Budget ("OMB"), treats "Hispanic or Latino" as an *ethnicity*, the members of which may belong to any race.[13] This bureaucratic definition, however, often fails to resonate with Hispanics themselves, who may hail from societies with quite different notions of racial identity.[14] Nor is this definition entirely

---

[12] Such confusion has been enduring. *See McCleskey v. Kemp*, 481 U.S. 279, 316 n.39 (1987) ("[I]n our heterogeneous society the lower courts have found the boundaries of race and ethnicity increasingly difficult to determine.").

[13] *See Hispanic Origin*, U.S. Census Bureau (July 25, 2013), http://www.census.gov/topics/population/hispanic-origin/about.html. The Census recognizes five races: "White," "Black or African American," "American Indian or Alaska Native," "Asian," and "Native Hawaiian or Other Pacific Islander." *Race*, U.S. Census Bureau (July 8, 2013), http://www.census.gov/topics/population /race/about.html. The government has differentiated "race" from "ethnicity" at least since Directive 15, issued by OMB in 1977. OMB's 1997 race and ethnicity standards use the same distinction. *See* Karen Humes & Howard Hogan, *Measurement of Race and Ethnicity in a Changing, Multicultural America*, 1 Race & Soc. Probs. 111, 119 & n.5 (2009) (article by Census Bureau professionals).

[14] *See* Nat'l Research Council, *Multiple Origins, Uncertain Destinies: Hispanics and the American Future* 41 (Marta Tienda & Faith Mitchell eds., 2006) ("*Multiple Origins*"). Puerto Rico provides one example of the potential absurdities generated by the imposition of North American racial taxonomies on Hispanic communities. After the United States acquired Puerto Rico in 1898, the percentage of Puerto Ricans classified as "white" grew with each decade of colonial rule, so that North American commentators hypothesized that the

12

intuitive to the mainstream media, which sometimes identifies "Latinos" with "blacks,"[15] and at other times rounds "Hispanic" to "white."[16] In response to this enduring confusion, the Census Bureau

island's black population was disappearing (whereas Puerto Ricans were perhaps simply learning the hard consequences of being identified as non-white in the United States). For sources, see José A. Cabranes, *Citizenship and the American Empire* 98 n.475 (1979) ("It is to be observed that while the census taken in 1887 shows a black population of 76,985, and that taken in 1897 reduces the figure to 75,824, the census of 1899 further reduces the figure to 59,390. If this decrease should continue for a number of years, the black race would eventually disappear from Porto Rico . . . . This is the only island in all the West Indies where the white population is so overwhelmingly in the majority. . . . In 1910 the colored population was 34.5 per cent of the whole; in 1920 it had declined to 27.0 per cent." (quoting 22 *Encyclopedia Americana* 403 (1939))).

In the 1950s, a growing recognition of the unreliability of Puerto Rico's racial Census data, as well as the Puerto Rican government's conviction that racial categorization was counterproductive, led the Census Bureau to stop collecting information about race in Puerto Rico altogether. (The practice resumed with the 2000 Census.) *See* Jorge Duany, *The Puerto Rican Nation on the Move: Identities on the Island and in the United States* 252-53 (2002); Mara Loveman & Jeronimo O. Muniz, *How Puerto Rico Became White: Boundary Dynamics and Intercensus Racial Reclassification*, 72 Am. Soc. Rev. 915, 935 (2007).

[15] Debates about affirmative action, for instance, often merge "black" and "Hispanic" into "minority." *See, e.g.*, Ford Fessenden & Josh Keller, *How Minorities Have Fared in States with Affirmative Action Bans*, N.Y. Times (June 24, 2013), http://www.nytimes.com /interactive/2013/06/24/us/affirmative-action-bans.html.

[16] This tendency surfaced, for instance, in coverage of *Ricci v. DeStefano*, 557 U.S. at 557, in which the plaintiffs were eighteen firefighters, whom media reports often described as simply white, even though one of the plaintiff firefighters was Hispanic. *See, e.g.*, Robert Barnes, *Justices Rule in Favor of White Firefighters in Racial-Bias Case*, Wash. Post (June 30, 2009), http://www.washingtonpost.com/wp-dyn/content/article/2009/06/29 /AR2009062901608.html. Academic discussion of the case sometimes makes the

is now considering whether to abandon separate taxonomies of "race" and "ethnicity" altogether: the 2020 Census may instead ask respondents to select the "categories" to which they belong.[17] Small wonder, then, that the parties in this case have struggled with whether, or in what sense, Bermudez might be both white *and* Hispanic.

Compounding the confusion, the relevant terminology has changed substantially over time. In 1930, but neither before nor since, the Census counted the "Mexican" race.[18] It was not until the 1950s,

---

same elision. *See, e.g.*, Reva B. Siegel, *Foreword: Equality Divided*, 127 Harv. L. Rev. 1, 52 (2013).

[17] *See* D'Vera Cohn, *Census Considers New Approach to Asking About Race—By Not Using the Term at All*, Pew Research Ctr. (June 18, 2015), http://www.pewresearch.org/fact-tank/2015/06/18/census-considers-new-approach-to-asking-about-race-by-not-using-the-term-at-all.

[18] Until 1930, Mexicans had been presumed to be white. Enumerators for the 1930 Census, however, were instructed that "all Mexican laborers are of a racial mixture difficult to classify"; at the same time, Mexicans who were "definitely white, Negro, Indian, Chinese, or Japanese" were to be counted in those respective categories. After the 1930 Census, Mexican-Americans—backed by the Mexican government—successfully lobbied to eliminate the "Mexican" category, largely because many civil rights, including the right to become an American citizen, depended on whiteness. *See* Humes & Hogan, *ante* note 13, at 117; *cf. Morrison v. People of State of Cal.*, 291 U.S. 82, 85 (1934) (noting that "[t]he privilege of naturalization is confined to aliens who are 'free white persons, and to aliens of African nativity and to persons of African descent,'" a definition that excluded people of Chinese, Japanese, Indian, American Indian, and Filipino descent (quoting 8 U.S.C. § 359)); *id.* at 95 n.5 ("There is a strain of Indian blood in many of the inhabitants of Mexico as well as in the peoples of Central and South America. . . . Whether persons of such descent may be naturalized in the United States is still an unsettled question.").

14

however, that the federal government consistently started tracking other Spanish-heritage groups, under the denomination of "persons of Spanish surname"[19]—a term that seems workable only if one ignores the possibility of intermarriage or the prevalence of "non-Spanish" surnames in Spanish-speaking countries.[20] As a result, many writers quickly adopted alternative terms that remain current today: "Hispanic" and "Latino."[21]

---

The stakes of Mexican-Americans' "whiteness" were evident in a seminal Fourteenth Amendment case, *Hernandez v. Texas*, 347 U.S. 475, 479 (1954), which found that "persons of Mexican descent constitute[d] a separate class in Jackson County, [Texas,] distinct from 'whites,'" whose systematic exclusion from juries was unconstitutional.

[19] For a summary of the Census Bureau's protean efforts to classify Hispanics, see the Appendix to this opinion. We note here that in the 1950 and 1960 Censuses, the federal government tracked only "white persons of Spanish surname." In other words, when Title VII was enacted in 1964, "Hispanics" were presumptively white.

[20] For example, the Chilean patriot Bernardo O'Higgins; the Dublin-born governor of Spanish Louisiana, Alejandro O'Reilly (who also designed the fortifications of San Juan, Puerto Rico); Vicente Fox, the former President of Mexico; and any number of Argentine presidents, including Arturo Frondizi, Néstor Kirchner, and Mauricio Macri—not to mention the Catholic Church's first Latin American pope, Jorge Bergoglio. The use of Spanish surnames for purposes of group identification was already under attack by the early 1950s. *See Hernandez*, 347 U.S. at 480-81 (using "persons with Mexican or Latin American surnames" to draw demographic conclusions); *id.* at 480 n.12 ("The State challenges any reliance on names as showing the descent of persons in the County. However, just as persons of a different race are distinguished by color, these Spanish names provide ready identification of the members of this class.").

[21] The choice between "Hispanic" and "Latino" occasionally provokes anxiety. *See* Nate Cohn, *Speaking of Identity: Choosing Between Latino and Hispanic*,

15

N.Y. Times (May 23, 2014), http://www.nytimes.com/2014/05/24/upshot/speaking-of-identity-choosing-between-latino-and-hispanic.html. As we have previously observed, the terms reflect "nuanced differences of perspective" regarding personal or ethnic identity. *Latino Officers Ass'n, N.Y., Inc. v. City of New York*, 196 F.3d 458, 460 n.1 (2d Cir. 1999). "Hispanic" emphasizes links to the language, people, or culture of Spain. "Latino" avoids that connection to the "Mother Country" and points instead to "Latin" America, a geographic entity fostered, ironically enough, by French imperialists who hoped to gain influence over the region by emphasizing historical and linguistic ties between France and the former colonies of Spain and Portugal. *Id.*

Despite occasional attempts to make one label more "correct" than the other—*see, e.g.*, Henry Fuhrmann, *Usage: 'Latino' Preferred over 'Hispanic'*, L.A. Times (July 28, 2011), http://latimesblogs.latimes.com/readers/2011/07/latino-preferred-over-hispanic-in-most-cases.html—both terms have respectable pedigrees. The *Oxford English Dictionary* records "Latino" as first appearing in English in 1946, but the word does not seem to have entered widespread use until the 1960s, *see Multiple Origins, ante* note 14, at 52 n.1. "Hispanic" began to be used in its modern ethnic sense in politics and public affairs at about the same time. *See, e.g.*, Br. of Amicus Curiae Louis J. Lefkowitz, Att'y Gen. of State of N.Y., at 39, *Katzenbach v. Morgan*, 384 U.S. 641 (1966) (Nos. 847, 877), 1966 WL 115487. (The word itself has a much longer history in other contexts, as suggested by institutions like the *Hispanic-American Historical Review* (founded 1918) and the Hispanic Society of America (founded 1904).) The idea that Hispanics formed a recognizable political bloc apparently did not emerge until the 1960 presidential election, when the Associated Press ran a two-sentence report that Senator John F. Kennedy had formed a national "Viva Kennedy" campaign to court "Spanish-speaking communities." *Kennedy Seeks Spanish Vote*, N.Y. Times, Sept. 12, 1960, at 22; *see also* Bonnie Angelo, *Bob Kennedy Tells How His Brother Did It*, Newsday, Nov. 10, 1960, at 5 (reporting the "new political development" of forming "clubs" to court voters "of Spanish extraction"); Peter Kihss, *City Spanish Vote at a Record High*, N.Y. Times, Nov. 2, 1960, at 30 (reporting Kennedy's predicted dominance among New York's "Puerto Rican and Spanish-speaking community"). Federal courts began using both "Hispanic" and "Latino" in the early 1970s. *See Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 371 F. Supp. 1328, 1332 (N.D. Cal. 1973) (first reported use of "Latino"); *Moss v. Stamford Bd. of Educ.*,

## 2. Section 1981

Despite societal confusion regarding Hispanic identity, the existence of a Hispanic "race" has long been settled with respect to § 1981.[22] Although that statute never uses the word "race," the Supreme Court has construed it as forbidding "racial" discrimination in public or private employment.[23] The Court has further defined "racial discrimination," for purposes of § 1981, as including discrimination based on "ancestry or ethnic characteristics."[24]

As a result, two people who both appear to be "white" in the vernacular sense of the term, and who would both identify as "white" on Census forms and the like, may nonetheless belong to different "races" for purposes of § 1981. Similarly, someone may

---

350 F. Supp. 879 (D. Conn. 1972) (Jon O. Newman, J.) (first reported use of "Hispanic").

For the sake of consistency, we use "Hispanic," which Hispanics themselves are more likely to choose (to the extent that they wish to adopt a pan-ethnic identity at all), and which, in any event, is entirely appropriate. *See* Cohn, *ante*. "Hispanic" also sidesteps the need for awkward neologisms, such as "Latin@" or "Latinx," in the name of "gender-neutral" language.

[22] 42 U.S.C. § 1981(a) provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."

[23] *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609, 613 (1987).

[24] *Id.* at 613.

belong to more than one "race" for purposes of that statute.[25] For instance, in *Saint Francis College v. Al-Khazraji*, the Supreme Court found that employment discrimination "based on the fact that [a plaintiff] was born an Arab" constitutes racial discrimination under § 1981, even though "under current racial classifications Arabs are Caucasians."[26]

As defendants themselves insist, Hispanics clearly constitute an ethnic group.[27] Defendants should hardly be surprised, then, that

---

[25] Consider a hypothetical white applicant whose ancestry is one-half Hispanic and one-half Irish. That person could, in principle, bring a race-discrimination suit if an employer

- refuses to hire him because he is Irish-American, and instead hires a white Italian-American;

- refuses to hire him because he is Hispanic, and instead hires a non-Hispanic Irish-American; or

- refuses to hire him because he is white, and instead hires a black Hispanic.

[26] 481 U.S. at 607, 613; *cf. Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616-17 (1987) (holding that Jews may bring a claim against non-Jewish whites under 42 U.S.C. § 1982, which forbids racially discriminatory interference with property rights).

[27] The Supreme Court has treated "Latinos" as an ethnic group in, for example, *Hernandez v. New York*, 500 U.S. 352, 355 (1991) (plurality). *Hernandez* involved a claim that a state prosecutor had "exercised peremptory challenges to exclude Latinos from the jury by reason of their ethnicity." *Id.* Because *Hernandez* was part of the line of cases flowing from *Batson v. Kentucky*, 476 U.S. 79 (1986), it hinged on whether the prosecutor's peremptory strikes "violate[d] the principle of race neutrality." *Id.* at 362. Although the *Hernandez* plurality found that the prosecutor had "offered a race-neutral basis for his exercise of peremptory

18

shortly after the Supreme Court decided *Saint Francis College*, our Court drew the obvious inference that discrimination against Hispanics—or "Latins" (sic), as Judge Winter's opinion put it—constitutes "racial discrimination" under § 1981.[28] Because § 1981 also forbids so-called "reverse discrimination,"[29] our 1988 holding in *Albert* necessarily implied that § 1981 also protects against discrimination based on *lack of* Hispanic ethnicity—something we had already assumed several years earlier.[30]

In short, despite defendants' repeated attempts to confuse an already complicated, vexed issue, it has long been settled in this circuit that Hispanics comprise a distinct race for purposes of § 1981.

---

challenges," *id.* at 372—implicitly treating "Hispanic" as a race—the Court expressly declined to "resolve the more difficult question of the breadth with which the concept of race should be defined for equal protection purposes," *id.* at 371.

[28] *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) (en banc); *see also Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991) (noting that § 1981 "protect[s] against discrimination on the basis not only of race, but also of ancestry or ethnic characteristics" (internal quotation marks omitted)); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) ("There can be no question that [§ 1981's ban on racial discrimination] includes persons . . . who are of Puerto Rican descent.").

[29] *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-87 (1976).

[30] *See Krulik v. Bd. of Educ.*, 781 F.2d 15, 21 (2d Cir. 1986).

### 3. Title VII

In contrast to our longstanding clarity with respect to § 1981, we have not yet resolved whether Hispanics constitute a race for purposes of Title VII. Title VII obviously affords a cause of action for discrimination based on Hispanic ethnicity—but why?

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer" to take adverse action against an employee because of that employee's "race, color, religion, sex, or national origin."[31] These categories—known as "protected characteristics" or "protected classes"—are not mutually exclusive. In particular, claims based on race and national origin "may substantially overlap or even be indistinguishable depending on the specific facts of a case."[32]

As a result, courts and litigants alike have struggled with the proper characterization of claims based on Hispanicity. Most courts have assumed that Hispanics constitute a "protected class" but without saying whether that protection derives from race or national origin.[33] Others have declared expressly that the underlying rationale

---

[31] 42 U.S.C. § 2000e-2(a).

[32] *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003).

[33] *See, e.g., De la Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996).

is irrelevant.[34] We have also recognized claims based on "Hispanic *ethnicity*," a term not used in Title VII.[35]

Although we have avoided the question so far, the proper categorization of Hispanicity has important analytical implications. Section 1981 prohibits discrimination on the basis of race but not on the basis of national origin.[36] Accordingly, if we were to treat Hispanicity as a national origin, but not as a race, for purposes of Title VII, plaintiffs in cases involving pro- or anti-Hispanic discrimination might in some circumstances need to present two different factual arguments in order to invoke the distinct remedies of that statute along with those of § 1981.[37]

In the present case, the District Court decided at the summary judgment stage that Hispanic did not constitute a national origin as a

---

[34] *See, e.g.*, *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 459 (S.D.N.Y. 1998) ("Whether being Hispanic constitutes a race or a national origin category is a semantic distinction with historical implications not worthy of consideration here.").

[35] *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015) (emphasis supplied); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 19 (2d Cir. 1995) (describing requirements for showing "an inference of ethnic discrimination" under Title VII).

[36] *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998).

[37] Although Title VII and § 1981 overlap in many respects, there are significant differences with respect to their statutes of limitations, employers' *respondeat superior* liability, the cognizability of claims against individuals (as opposed to organizations), and whether a plaintiff must show that discrimination was intentional. *See Patterson*, 375 F.3d at 225-27.

matter of law.[38] At the same time, the District Court "assumed as a matter of law that Hispanic was a type of race."[39] Later, however, the Court reversed course and determined that the existence of a Hispanic "race" was a question of fact to be decided by the jury.[40]

We disagree with the District Court's ultimate decision to treat the existence *vel non* of a Hispanic "race" as a question of fact. The meaning of the word "race" in Title VII is, like any other question of statutory interpretation, a question of law for the court.[41] Here, however, the District Court's error was harmless, because the jury reached the same conclusion as we do today: that discrimination based on ethnicity, including Hispanicity or lack thereof, constitutes racial discrimination under Title VII.

We reach this conclusion for two reasons. First, we analyze claims of racial discrimination identically under Title VII and § 1981 in other respects, and we see no reason why we should not do the same with respect to how we define race with for purposes of those

---

[38] *See Barrella*, 43 F. Supp. 3d at 145.

[39] *Id.*

[40] *See id.* at 170, 172.

[41] *See, e.g., Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 133 (1976) (defining "discrimination"), *superseded by statute on other grounds*, Pregnancy Discrimination Act of 1978, Pub. L. 95-555, § 1, 92 Stat. 2076; *McMenemy v. City of Rochester*, 241 F.3d 279, 284 (2d Cir. 2001); *Simonton v. Runyon*, 232 F.3d 33, 36 (2d Cir. 2000) (defining "sex" under Title VII).

statutes.[42] Second, we have repeatedly assumed that claims of ethnicity-based discrimination, including discrimination based on Hispanicity, are cognizable as claims of racial discrimination under Title VII, albeit without holding so explicitly. In *Malave v. Potter* (2003), for instance, we implicitly acknowledged the viability of a Title VII race-discrimination claim based on Hispanic ethnicity.[43] Similarly, in *Krulik v. Board of Education* (1986), we assumed the viability of a Title VII claim for intentional racial discrimination based on the plaintiff's status as "white, Jewish, and/or not Hispanic."[44] The Supreme Court has similarly assumed that Title VII's definition of race encompasses ethnicity.[45]

To be clear, a claim of discrimination based on Hispanic ethnicity or lack thereof may *also* be cognizable under the rubric of national-origin discrimination, depending on the particular facts of

---

[42] *See, e.g.*, *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015); *Choudhury v. Polytechnic Inst. of N.Y.*, 735 F.2d 38, 44 (2d Cir. 1984).

[43] 320 F.3d 321, 324 (2d Cir. 2003).

[44] 781 F.2d at 21.

[45] *See Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 464 n.37 (1986) (plurality opinion) (discussing a potential Title VII claim of "preferential treatment to blacks and Hispanics based on race"); *cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) ("The antidiscrimination provision [of Title VII] seeks a workplace where individuals are not discriminated against because of their racial, *ethnic*, religious, or gender-based status." (emphasis supplied)).

each case.[46] We hold only that for purposes of Title VII, "race" encompasses ethnicity, just as it does under § 1981.[47]

---

[46] *See, e.g.*, *United States v. Brennan*, 650 F.3d 65, 134 (2d Cir. 2011) (treating "Hispanic" as a national origin); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) (same).

[47] We recognize that the Executive Branch may disagree with our interpretation. As we noted above, the federal government generally treats "Hispanic" as a national origin, not as a race. For instance, OMB guidelines require the Census Bureau and other federal agencies to classify "Hispanic" as a national origin. *See ante* note 13 and accompanying text. Similarly, although the EEOC has not adopted a definition of race for purposes of Title VII, it generally follows OMB in treating "Hispanic" as a national-origin category. *See* EEOC Compliance Manual § 15-II.

At the same time, the EEOC has recognized that discrimination based on *ancestry* can qualify as racial discrimination under Title VII; the EEOC has also noted the possibility of "considerable overlap" between "race" and "national origin" categories. *Id*. Moreover, the EEOC has suggested that discrimination complaints involving Hispanics may implicate race. *See, e.g., id.* (noting that "a discrimination complaint . . . by a dark-skinned Latino" might "implicate race, color, and national origin"); *id.* § 15-V (discussing a hypothetical "race/national origin" claim by a Hispanic); *id.* § 607.2 (noting that an employer might acknowledge, as part of an affirmative-action plan, that "race and national origin played a part in" selecting a "Hispanic male" instead of an "Anglo male").

In any case, we need not grapple with these nuances of Executive Branch practice. No party has argued that the Government's reading of Title VII is controlling; and the EEOC's interpretation is entitled at most to so-called *Skidmore* deference—*i.e.,* "deference to the extent it has the power to persuade." *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 53 (2d Cir. 2012); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013); *Barrows v. Burwell*, 777 F.3d 106, 109 n.6 (2d Cir. 2015) ("[U]nder so-called '*Skidmore* deference,' we give effect to an agency's non-legislative interpretation of a statute to the extent we find it persuasive." (internal quotation marks omitted) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

## 4. Defendants' Rule 50 Motions for Judgment as a Matter of Law

We now apply these conclusions to the present case. We review *de novo* a district court's decision whether to grant a motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.[48] Where, as here, a jury has returned a verdict in favor of the non-movant, a district court may grant a Rule 50 motion "only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that a reasonable juror would have been *compelled* to accept the view of the moving party."[49]

That is not the case here. Defendants offer three arguments on appeal as to why the District Court erred in denying them judgment as a matter of law: (1) "Hispanic" is not a race as a matter of law; (2) even if "Hispanic" is a race as a theoretical matter, it was not shown at trial that Bermudez and Barrella are members of different races; and (3) Hardwick should in any case be protected by qualified immunity, because it was not clearly established in 2010 that Bermudez and Barrella belonged to different races as a matter of law.

Each argument fails. As we have just established, Hispanics constitute a race as a matter of law, under both § 1981 and Title VII. And the evidence presented at trial unambiguously showed that Hardwick considered Bermudez, but not Barrella, to be Hispanic. Hardwick repeatedly identified Bermudez as Hispanic or Latino, and

---

[48] *Cash v. Cty. of Erie*, 654 F.3d 324, 332 (2d Cir. 2011).

[49] *Id.* at 333 (emphasis in original; internal quotation marks omitted).

25

he frequently referred to him as the Village's "first Hispanic police chief."[50] Furthermore, although Bermudez self-identified as "white," he also described himself as "Hispanic."[51] Barrella, for his part, described himself as "White of Italian descent," and there is no indication that anyone ever considered him to be Hispanic.[52] Accordingly, the jury had ample justification for concluding that Barrella and Bermudez belonged to different "races" for purposes of § 1981 and Title VII.[53]

Finally, we reject Hardwick's qualified-immunity argument, which contends—rather incredibly—that it was "objectively reasonable" for him to believe in 2010 that federal law did not forbid discrimination based on Hispanic ethnicity.

As is well known, "[t]he doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate

[50] *See* Barrella Br. 9-10, 12, 40; *see also* J.A. 3189 (recounting Hardwick's testimony that he "kn[e]w that [Bermudez] was Hispanic"); J.A. 3188 (noting Hardwick's acknowledgment that Bermudez is "a White Latino male"); *see also* Hardwick Reply Br. 13-14 ("Hardwick has never claimed that he was unaware that Bermudez was Hispanic.").

[51] Village Br. 41.

[52] *See, e.g.*, J.A. 3141. Defendants' repeated insistence that Barrella "fail[ed] to establish his own race," *e.g.*, Village Reply Br. 25, is baseless.

[53] Because the parties agree that Bermudez is Hispanic—even if they contest the significance of that designation—we need not decide whose definition of "Hispanic" matters. *Cf. Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 200 (2d Cir. 2006) (noting that federal and New York law define "Hispanic" differently).

clearly established statutory or constitutional rights of which a reasonable person would have known."[54] The determination of qualified immunity depends both on the specific facts of an official's actions—*e.g.*, "what situation confronted [him], what acts he performed, and his motivation in performing those acts"—and on the clarity of the legal rules governing that particular conduct.[55]

This case presents many knotty legal and factual issues. For purposes of qualified immunity, however, the question is simple. The jury found that Hardwick appointed Bermudez rather than Barrella because the former was "a White person of Hispanic origin" and the latter was "a White person of Italian origin."[56] Would a reasonable official in Hardwick's position have known that such intentional discrimination against non-Hispanic whites violated Barrella's rights under federal antidiscrimination law?[57]

---

[54] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

[55] *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012).

[56] Hardwick Reply Br. 10; *see* J.A. 2379.

[57] Importantly, Hardwick does not argue that the law was not clearly established with respect to when intentional racial discrimination might be permissible. For instance, he does not claim that he gave preference to a Hispanic as part of an arguably lawful affirmative-action program, or that he was attempting to appeal to Hispanic voters. *See* Section II.B.2, *post.* Accordingly, we consider qualified immunity with respect to "unjustified" racial discrimination only.

The answer is plainly yes. As Hardwick acknowledges, a right is clearly established if "the Supreme Court or the Second Circuit has recognized the right."[58] Under that standard, it has been clear since the Reagan Administration that § 1981 bars employers from discriminating based on Hispanic ethnicity or lack thereof.[59] Indeed, defendants manage to obscure the clarity of established law only by failing to cite *Albert v. Carovano* in any of the four briefs they collectively submitted, despite the District Court's citation of that case in its opinions below.[60]

---

[58] *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006) (internal quotation marks omitted).

[59] *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) (en banc). That the District Court expressed some confusion about this issue does not alter the clarity of existing law. *Cf. Mangino v. Incorporated Vill. of Patchogue*, 808 F.3d 951, 959 n.9 (2d Cir. 2015) (noting that multiple district-court decisions may serve as *evidence* of an ambiguity in case law only where conflicting Second Circuit precedents *created* such ambiguity). Defendants point to no case suggesting that a plaintiff may not bring a claim of discrimination based on Hispanicity under § 1981 or Title VII.

[60] Nor did either defendant cite *Saint Francis College* in its principal brief. We remind counsel that attorneys have an ethical obligation to "disclose to the tribunal controlling legal authority known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel." N.Y. Rules of Prof'l Conduct 3.3(a)(2). That duty of candor extends to an appellant's opening brief. *See La Cucina Mary Ann, Inc. v. State Liquor Auth.*, 541 N.Y.S.2d 220, 220 (2d Dep't 1989) ("[W]e remind counsel for the appellants of his affirmative obligation to advise the court of authorities adverse to his position . . . ."); *cf. United States v. Gaines*, 295 F.3d 293, 302 (2d Cir. 2002) (observing that "failure to cite controlling authority is at best inexcusably poor lawyering and at worst suggests counsel's ignorance or violation of" the rules of professional conduct (internal quotation marks omitted)); *Jorgenson v. Cty. of Volusia*, 846 F.2d 1350, 1352 (11th Cir. 1988)

The most charitable reading of Hardwick's assertion of qualified immunity is that the law was unsettled with respect to Title VII. But Title VII is irrelevant to Hardwick's personal liability, which stems solely from § 1981.[61] And in any event, it has long been obvious under Title VII that employers may not discriminate based on Hispanic ethnicity, even if it has not hitherto been clearly established that such discrimination would constitute discrimination *on the basis of race*.[62] In short, we conclude that the District Court correctly denied defendants' pre- and post-verdict motions for judgment as a matter of law pursuant to Rule 50.[63]

---

("The appellants are not redeemed by the fact that opposing counsel *subsequently* cited the controlling precedent. The appellants had a duty to refrain from affirmatively misleading the court as to the state of the law. They were not relieved of this duty by the possibility that opposing counsel might find and cite the controlling precedent . . . ." (emphasis in original)).

[61] *See Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 255 (2d Cir. 2014) ("Since Title VII imposes no liability on individuals, the doctrine of qualified immunity is irrelevant to plaintiff's Title VII claims." (internal quotation marks omitted)).

[62] *See, e.g., De la Cruz*, 82 F.3d at 20.

[63] Because § 1981 and Title VII provide sufficient bases for affirming the District Court's denial of judgment as a matter of law, we need not consider whether NYSHRL likewise defines "Hispanic" as a race. Neither the District Court nor the parties have suggested that NYSHRL provides any remedy or substantive right at issue in this case distinct from those provided by § 1981 or Title VII. *Cf. Lore*, 670 F.3d at 169 ("[D]iscrimination claims under the [NYS]HRL are evaluated using the same analytical framework used in Title VII actions . . . ."). More important, defendants forfeited any claim regarding NYSHRL's arguably different definition of race by failing to discuss the issue in their principal briefs. *See Norton v. Sam's Club*, 145 F.3d 114, 117-18 (2d Cir. 1998).

## B. The District Court's Evidentiary Rulings

We next consider defendants' argument that we should vacate the District Court's judgment and order a new trial because of several erroneous evidentiary rulings permitting the admission of lay opinion testimony in violation of Rule 701 of the Federal Rules of Evidence. We agree with defendants that the District Court erred in allowing several witnesses to speculate about Hardwick's motivation for various employment decisions, and that the errors warrant a new trial.[64]

A party challenging a district court's evidentiary rulings is generally entitled to a new trial if (1) "the district court committed errors that were a clear abuse of discretion," and (2) those errors "were clearly prejudicial to the outcome of the trial, where prejudice is measured by assessing the error in light of the record as a whole."[65] As we have often explained, "'abuse of discretion' is a distinctive term of art that is not meant as a derogatory statement about the

---

[64] Defendants also challenge the District Court's decision not to admit into evidence 2010 U.S. Census data for Freeport. The Census data would have been relevant, defendants argue, because it would have shown the jury that the federal government defines "Hispanic" as an ethnicity, not a race. But as we have already stated, Hispanics constitute a race under § 1981 and Title VII as a matter of law. *See ante* Section II.A. Accordingly, the parties will have no need on remand to present evidence on this issue.

[65] *Marshall v. Randall*, 719 F.3d 113, 116 (2d Cir. 2013) (internal quotation marks omitted).

district judge whose decision is found wanting."[66] Rather, the term merely signifies that a district court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions."[67]

## 1. Did the District Court "Abuse Its Discretion"?

The Village argues that the District Court abused its discretion in allowing the jury to consider unsupported lay opinion testimony regarding Hardwick's reasons for promoting Bermudez. The Village objects principally to testimony by Alfred Gros and Raymond Maguire, as well as by Anthony Miller, Shawn Randall, Debbie Zagaja, and Michael Woodward. The Village contends that these witnesses impermissibly speculated as to Hardwick's motives for various personnel decisions, in violation of Rule 701(b) of the Federal Rules of Evidence.

Rule 701 permits a lay witness—*i.e.*, one not testifying as an expert—to testify "in the form of an opinion." But as Rule 701(b) provides, such opinion testimony is admissible only if it is "helpful to clearly understanding the witness's testimony or to determining a

---

[66] *United States v. Park*, 758 F.3d 193, 199-200 (2d Cir. 2014).

[67] *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks and citation omitted).

fact in issue."[68] As we explained in *Hester v. BIC Corp.*, Rule 701(b) helps to protect "against the admission of opinions which would *merely tell the jury what result to reach*," rather than providing information that would assist the jury in drawing its own conclusions.[69] In employment discrimination actions, "Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision."[70] Although witnesses may testify regarding "their own observations of the defendant's interactions with the plaintiff or with other employees," they may not opine as to the motives, racial or otherwise, underlying those interactions.[71]

We agree with the Village that the District Court permitted the jury to consider testimony by several witnesses that amounted to the "naked speculation" forbidden by Rule 701(b). We focus here on the

---

[68] Defendants do not challenge the admission of the testimony under Rule 701(a), which requires that such testimony be "rationally based on the witness's perception."

[69] 225 F.3d 178, 181 (2d Cir. 2000) (emphasis in original). *Hester* was decided on September 14, 2000, at which time Rule 701(b) used slightly different language: "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *See* Fed. R. Evid. 701(b) (1987) (amended 2000). That language remained unchanged by the 2000 amendments. The 2011 amendments, which brought the rule into its present form, were "stylistic only." Fed. R. Evid. 701(b) advisory committee's note to 2011 amendments. Accordingly, *Hester*'s interpretation of Rule 701(b) remains valid today.

[70] *Hester*, 225 F.3d at 185.

[71] *Id.*

testimony of Albert Gros, Freeport's former assistant chief of police, and Raymond Maguire, Hardwick's former chief of staff.[72]

We begin with Gros, who testified that "there might have been a component of race involved in [Hardwick's] decision" to promote Bermudez.[73] Gros repeatedly emphasized that this statement reflected only his "own personal opinion."[74] On further probing from Judge Spatt, Gros elaborated that his opinion was based on observing "the actions that [he] saw leading up to" various other promotions that had occurred in the Village at about the same time.[75] Specifically, Gros suggested that Hardwick had recommended new heads of the Human Resources, Public Works, and Building departments because of their respective races and despite their lack of qualifications.[76] At the same time, Gros testified that he had no personal knowledge of

---

[72] Barrella argues that defendants failed to preserve or to properly present for appellate review their Rule 701(b) arguments, except possibly with respect to the testimony of Gros. *See* Barrella Br. 48. That argument is meritless. Defendants' counsel objected to the introduction of inappropriate lay opinion testimony throughout the trial and in their Rule 50 motions. *See* J.A. 3445, 3447. The Village raised these arguments again on appeal, arguing expressly that testimony by Gros and Maguire did not comply with Rule 701. *See* Village Br. 28-35.

[73] J.A. 3225.

[74] *Id.*

[75] *Id.*

[76] For instance, Gros testified that the new head of Human Resources "couldn't possibly be qualified to do what she was doing," and that the only explanation he could imagine for her being hired was "that she was a female Hispanic." J.A. 3225-26.

any of those new hires' qualifications or the qualifications of their predecessors. He also testified that he was not familiar with the responsibilities that those positions entailed or the criteria Hardwick used in making his appointments.[77]

Maguire also testified that race was a motivating factor in Hardwick's personnel decisions.[78] Like Gros, Maguire reached this conclusion without any personal knowledge of Hardwick's actual reasons. Indeed, Maguire had "no firsthand knowledge whatsoever with regard to . . . Hardwick's thinking" in appointing Bermudez.[79] Instead, Maguire based his conclusion on his "grave concerns" about Hardwick's decision to replace Superintendent of Buildings Joe Madigan, who is white, with Richard Brown, who is black.[80] Although Maguire initially suggested that Brown was so unqualified that race must have played a role in his appointment, Maguire later admitted that he was unaware of Brown's qualifications.[81]

In short, the District Court permitted Gros and Maguire to testify that Hardwick had recommended individuals for promotion

---

[77] For instance, Gros testified that he had had "very, very little interaction" with Hardwick and had never worked with him as assistant chief or deputy chief. J.A. 3227.

[78] J.A. 3260.

[79] J.A. 3280.

[80] J.A. 3262.

[81] J.A. 3284.

based on their race, despite those witnesses' admissions that they had no personal knowledge of Hardwick's selection process and only the vaguest idea of the relevant candidates' qualifications. Such testimony was not helpful to the jury in the sense required by Rule 701(b), and the District Court's decision to allow the jury to consider it was an "abuse of discretion."[82]

## 2. Was the District Court's Error Harmless?

This error was sufficiently prejudicial to warrant a new trial. "[W]e are especially loath to regard any error as harmless in a close case," and this case "was factually very close."[83]

Defendants presented evidence showing that Hardwick had several non-discriminatory reasons to prefer Bermudez over Barrella. Most important, Hardwick and Bermudez were longtime friends and Fire Department colleagues, while Hardwick and Barrella barely

---

[82] We note that the District Court also may have admitted testimony in violation of Rule 701(b) from Shawn Randall, a Freeport police officer and president of the Police Benevolent Association, who testified that Hardwick had favored two police officers because they were black. Like Gros and Maguire, Randall offered unsubstantiated speculation regarding Hardwick's motivations. *See* J.A. 3303 (noting, with respect to one black police officer allegedly favored by Hardwick, that "race must have been a factor" in her preferment because she had unspecified "baggage"). Because the Village's briefs never discussed Randall's testimony in the context of its Rule 701(b) argument, however, we do not consider whether that testimony was in fact permissible under the Federal Rules of Evidence.

[83] *Hester*, 225 F.3d at 185 (internal quotation marks omitted).

knew each other.[84] As courts have repeatedly held, federal antidiscrimination law does not forbid an employer from making an employment decision "based on loyalty to a friend or relative," even if that decision "benefit[s] the nonprotected friend or relative at the expense of a more qualified, protected person."[85] To put it more bluntly: neither § 1981 nor Title VII forbids favoritism, nepotism, or cronyism, so long as it is not premised on animus against a protected class.[86] Furthermore, Hardwick repeatedly testified that it was politically advantageous to appoint Bermudez, a Freeport native, rather than someone who had never lived in the Village and who apparently had no political allies there.[87]

---

[84] *See, e.g.*, J.A. 3151 (noting Barrella's testimony that before taking the promotional examination, he "had absolutely no relationship" with Hardwick).

[85] *Neal v. Roche*, 349 F.3d 1246, 1251 (10th Cir. 2003).

[86] *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1096 (6th Cir. 1996); *Foster v. Dalton*, 71 F.3d 52, 56 (1st Cir. 1995); *Holder v. City of Raleigh*, 867 F.2d 823, 825-26 (4th Cir. 1989); *see also Krulik*, 781 F.2d at 21 ("Nothing in §§ 1981 or 1983 prevents a municipal supervisor from promoting those employees with whom she prefers to work."); *DeCintio v. Westchester Cty. Med. Ctr.*, 807 F.2d 304, 308 (2d Cir. 1986) (holding that an employer did not engage in sex discrimination by appointing his female "paramour" rather than qualified male applicants). Of course, it may be that an employment practice that rewards an employer's friends to the detriment of strangers could theoretically have an adverse impact on members of a protected class and thus could be actionable under Title VII. But Barrella did not assert an adverse-impact claim in this litigation.

[87] *See, e.g.*, J.A. 3197, 3218. Hardwick testified "that he did not appoint [Barrella] primarily because he did not receive 'any real noticeable encouragement' from any of the members of the [Village] Board of Trustees or anybody else regarding [his] candidacy." *Barrella*, 43 F. Supp. 3d at 152 (quoting

36

Barrella, for his part, offered three pieces of evidence (not counting the impermissible lay opinion testimony), each of which suffers from potential defects.

First, Barrella offered evidence that during Hardwick's tenure as mayor, the Village's hiring disproportionately favored non-whites. At the most senior level, however—the hiring with which Hardwick was most closely involved—the appointment of new department heads actually *underrepresented* Hispanics and *overrepresented* non-Hispanic whites compared to Freeport's population.[88] This hardly constitutes unambiguous evidence of bias in favor of blacks and Hispanics.

Second, Barrella argues that he had "vastly superior qualifications" to Bermudez.[89] But that claim is overstated.[90] Barrella

---

J.A. 3199). As Hardwick's counsel put it, "no one gave [Hardwick] a reason to interview Chris Barrella." J.A. 3097.

[88] Hardwick nominated 18 department heads, four of whom were Hispanic (*i.e.*, about 22 percent), six black (*i.e.*, about 33 percent), and eight non-Hispanic white (*i.e.*, about 44 percent). J.A. 2124. Freeport's population is approximate one-third white, one-third black, and one-third "Hispanic." Hardwick Br. 14.

Barrella also presented evidence that "Blacks and Hispanics constituted 96 percent of seasonal hires," 69 percent of part-time hires, and 61 percent of full-time hires in the Village during Hardwick's tenure. J.A. 3091-92. However, Barrella does not suggest that Hardwick was personally involved in those hiring decisions. *See also* J.A. 3166 (recording Hardwick's testimony that he exercised sole appointing authority only for the position of Chief of Police).

[89] Barrella Br. 40.

37

and Bermudez each offered distinct advantages, and Hardwick was entitled to weigh which he most valued. Moreover, even to the extent that Barrella was more qualified, federal antidiscrimination law "does not require that the candidate whom a court considers most qualified for a particular position be awarded that position; it requires only that the decision among candidates not be discriminatory."[91]

Finally, Barrella points to Hardwick's repeated references to Bermudez as Freeport's "first Hispanic" or "first Latino" police chief. This last point raises some difficult questions of law, which we urge the parties and the District Court to consider carefully on remand.

We begin with the obvious point that an employer need not feign ignorance of an employee's race to avoid violating federal antidiscrimination law. Indeed, the Supreme Court has expressly

---

[90] As Barrella concedes, Bermudez was legally eligible for appointment, since both men earned one of the three highest scores on the March 2010 promotional examination. *See* J.A. 203.

Although Barrella had a higher test score, more degrees, and more time as a lieutenant than Bermudez, Bermudez had served longer in the Police Department, was a native and resident of Freeport, and had stronger ties to Hardwick and to the Village. J.A. 107, 113. Hardwick frequently emphasized his desire to appoint a Village resident as chief, and in fact, Police Department rules seem to have required officers to live in the Village, although the requirement was often honored in the breach. *See* J.A. 3120. Moreover, Hardwick testified that the outgoing chief, Michael Woodward, recommended Lieutenants Bermudez and Zagaja as his potential successors—not Barrella. J.A. 3184, 3190.

[91] *See Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980).

38

acknowledged the lawfulness of affirmative-action initiatives designed to remedy past discrimination, as long as they do not employ tools, "such as quota systems, set-aside programs, and differential scoring cutoffs, which utilize express racial classifications and which prevent non-minorities from competing for specific slots."[92] Accordingly, an employer's stated desire for diversity in the workplace does not, without more, establish discriminatory intent with respect to any particular employment decision.[93]

Moreover, neither § 1981 nor Title VII categorically forbids politicians from considering an appointment's political implications. As the Seventh Circuit has observed, "it is not a violation of Title VII"—or of § 1981—"to take advantage of a situation to gain political favor."[94] Indeed, the urge of politicians to take credit for hiring or promoting members of hitherto underrepresented communities has

---

[92] *Hayden v. Cty. of Nassau*, 180 F.3d 42, 49 (2d Cir. 1999); *accord Johnson v. Transp. Agency*, 480 U.S. 616, 620, 640-41 (1987). Defendants do not argue that Bermudez's appointment was part of such an affirmative-action program.

[93] *See Hayden*, 180 F.3d at 48-50; *Silver v. City Univ. of N.Y.*, 947 F.2d 1021, 1022 (2d Cir. 1991).

[94] *See Henry v. Jones*, 507 F.3d 558, 567 (7th Cir. 2007). Federal antidiscrimination statutes are not the only part of our law to sit uneasily with some modes of traditional politics. The Seventh Circuit recently vacated certain counts of conviction of former Illinois governor Rod Blagojevich for trying to "sell" a Senate seat, on the ground that prosecutors improperly conflated bribery and extortion with ordinary political "logrolling"—a well-established practice than may be unethical or unwise, but which, like certain forms of ethnic politics, is often permissible under federal law. *See United States v. Blagojevich*, 794 F.3d 729, 734-38 (7th Cir. 2015), *petition for cert. filed* (U.S. Nov. 17, 2015) (No. 15-664).

often "been a powerful means of achieving the social and political integration of excluded groups."[95]

Of course, ethnic politics is not always benign.[96] A governmental employer may not excuse otherwise unlawful discrimination by pleading that it was simply responding to voters'

---

[95] *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 108 (1990) (Scalia, J., dissenting); *see also Miller v. Johnson*, 515 U.S. 900, 944 (1995) (Ginsburg, J., dissenting) (describing the "ethnic character" of urban politics, including the use of ethnically "'balanced tickets'" to ensure broad electoral appeal (quoting Nathan Glazer & Daniel P. Moynihan, *Beyond the Melting Pot: The Negroes, Puerto Ricans, Jews, Italians, and Irish of New York City* 20 (1963))). As the Supreme Court observed in the context of the Voting Rights Act,

> there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics.

*Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994).

[96] *See, e.g., City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion) ("Absent searching judicial inquiry into the justification for . . . race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by . . . simple racial politics.").

preferences.[97] Our point is only that an otherwise lawful employment decision—one that was made for race-neutral reasons or as part of a lawful affirmative-action plan—does not become unlawful merely because the decision-maker believed that some voters might evaluate that decision at least partly through the lens of identity politics.

The line between legitimate politics and illegitimate racial discrimination can be difficult to draw in practice[98]—which reinforces our assessment of this case as factually close. This trial presented inherently thorny questions of motivation, which were further complicated by pervasive uncertainty about the definition of race. In an otherwise confusing trial, the lay opinion testimony at issue here presented some of the clearest claims about Hardwick's motives. Unsurprisingly, Barrella's counsel emphasized that testimony during the summation and rebuttal. The jury's five-day deliberation suggests that it continued to regard this case as difficult until the end. Accordingly, we have little trouble concluding that this case was sufficiently close that "even the smallest error may have

---

[97] *See Brennan*, 650 F.3d at 115 n.51; *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1224 (2d Cir. 1987); *see generally* Don Herzog, *The* Kerr *Principle, State Action, and Legal Rights*, 105 Mich. L. Rev. 1 (2006).

[98] *Compare Ricci*, 557 U.S. at 597, 605 (Alito, J., concurring) (condemning an employment action as an "illegitimate" attempt "to placate a politically important racial constituency," but denying that he has "equat[ed] political considerations with unlawful discrimination"), *with id.* at 642 (Ginsburg, J., dissenting) ("[T]here are many ways in which a politician can attempt to win over a constituency—including a racial constituency—without engaging in unlawful discrimination.").

been enough to tilt the balance,"[99] and that the prejudice caused to defendants by the District Court's Rule 701 rulings warrants a new trial.

## C. The Village's *Respondeat Superior* Liability

Because we conclude that a new trial is required, we need not consider the parties' remaining arguments.[100] Nonetheless, we offer some guidance regarding one more issue that is likely to recur at trial: whether the District Court erred in failing to instruct the jury that a municipality may not be held liable under a theory of *respondeat superior*.

The Village's argument that Judge Spatt erred in this respect is meritless. As the Village rightly points out, a municipality may not be held liable under §§ 1981 or 1983 for an injury inflicted by its agents unless "the challenged acts were performed pursuant to a municipal

---

[99] *See Hester*, 225 F.3d at 185 (internal quotation marks omitted).

[100] Namely, defendants' arguments that the District Court erred in denying defendants' Rule 59 motion for a new trial, because the jury's verdict was against the weight of the evidence; that the District Court improperly coerced the jury to render a verdict; that the District Court erred in denying remittitur; and that the District Court awarded unreasonably high attorneys' fees to Barrella. Similarly, we need not consider Barrella's argument that the District Court erred in declining to award additional compensation to offset the negative tax consequences of his receiving his damages for front and back pay as a lump sum.

policy or custom."[101] But for two reasons, that argument carries no weight in the present case.

First, Barrella sued under both § 1981 and Title VII, the latter of which does indeed permit *respondeat superior* liability.[102] Since the same substantive standards govern claims under both statutes,[103] a verdict that Hardwick intentionally discriminated against Barrella within the meaning of § 1981 would, absent any other defenses, entail a violation of Title VII—and, thus, respondeat superior liability for the municipality.

Second, even under § 1981, a municipality may be held liable for the actions of high-ranking officials with final policymaking authority.[104] In particular, even a single adverse employment action, "if ordered by a person whose edicts or acts may fairly be said to represent official policy, can, by itself, support a claim against a municipality."[105] Here, Freeport concedes that Hardwick exercised "the sole authority to appoint a Chief of Police."[106] The Village may

---

[101] *Littlejohn*, 795 F.3d at 314 (internal quotation marks omitted); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[102] *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013) (discussing vicarious liability under Title VII in the context of workplace harassment).

[103] *See Wiercinski*, 787 F.3d at 113.

[104] *See Littlejohn*, 795 F.3d at 315.

[105] *Id.* (internal quotation marks omitted).

[106] Village Br. 11.

therefore be held liable in the event that the jury finds that Hardwick intentionally discriminated against Barrella on the basis of race. [107]

### III. CONCLUSION

To summarize, we hold as follows:

(1) The meaning of "race" for purposes of 42 U.S.C. § 1981 and Title VII is, like other questions of statutory interpretation, a matter of law.

(2) As a matter of law, "Hispanic" is a race for purposes of § 1981 *and* Title VII.

> a. Longstanding Supreme Court and Second Circuit precedent defines "race," for purposes of § 1981, as encompassing ethnicity. Accordingly, it has been clear at least since our decision in *Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988) (en banc), that § 1981 protects against discrimination based on ethnicity, including Hispanic ethnicity or lack thereof.

> b. Because it has been clearly established at least since 1988 that "Hispanic" describes a race for purposes of

---

[107] *See Patterson v. City of Utica*, 370 F.3d 322, 331 (2d Cir. 2004) ("[S]ince the City concedes that its mayor is a high-ranking official with final policymaking authority in the municipal employment area at issue in this case, the City can, pursuant to § 1983, be held liable for the actions of its mayor.").

§ 1981, we reject Hardwick's assertion of qualified immunity based on his claim that it was "objectively reasonable" for him to believe that discrimination based on Hispanic ethnicity did not constitute racial discrimination under federal law.

c. Under Title VII, as with § 1981, "race" encompasses ethnicity. Accordingly, a plaintiff who alleges employment discrimination based on Hispanic ethnicity or lack thereof may be able to state a claim of racial discrimination within the meaning of Title VII.

We therefore **AFFIRM** the judgment of the District Court insofar as it denied defendants' motions for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.

(3) The District Court erred in admitting lay opinion testimony that impermissibly speculated as to Hardwick's reasons for promoting Bermudez, in violation of Rule 701(b) of the Federal Rules of Evidence.

a. Reviewing the District Court's evidentiary rulings under the so-called "abuse of discretion" standard, we conclude that the District Court erroneously allowed lay witnesses to speculate that racial considerations may have influenced Hardwick's appointment of Bermudez.

45

b. Because this was a factually close case, we conclude that the District Court's error prejudiced defendants, and that a new trial is necessary. Accordingly, we **VACATE** the District Court's judgment and **REMAND** to the District Court for a new trial consistent with this opinion.

# Appendix: Census Treatment of "Hispanics"

The following table summarizes the various labels the Census has employed to track the group we now call "Hispanic." Unless otherwise specified, citations are to U.S. Census Bureau, *Measuring America: The Decennial Censuses from 1790 to 2000* (2002) ("*Measuring America*").

| Census Year | Classification/Question | "Hispanic" Responses | Notes | Citation |
|---|---|---|---|---|
| *1930* | "Color or race" | "Mexican" | Until 1930, "Mexicans" had been "white." | *Measuring America* at 59 |
| *1940* | "Color or race" | (None) | "Mexicans" once again became "white," unless they were "definitely" some other race. | *Measuring America* at 62, 64 |
| | "Mother tongue" | Spanish | First time Census tabulated linguistic data on native-born Americans. | Humes & Hogan, *ante* note 13, at 117 |
| *1950* | "White population of Spanish surname" | Based on a list of 6,000 Spanish surnames compiled by the Immigration & Naturalization Service | Compiled only for five states (AZ, CA, CO, NM, TX). | U.S. Census, *Special Reports: Persons of Spanish Surname* 3C-3 (1953) |

| Census Year | Classification/Question | "Hispanic" Responses | Notes | Citation |
|---|---|---|---|---|
| *1960* | Same as 1950 Census | | Census also counted "Puerto Ricans in the United States." | U.S. Census, *Special Reports: Persons of Spanish Surname,* at vii (1963) |
| *1970* | "Is this person's origin or descent—"? | "Mexican"; "Puerto Rican"; "Cuban"; "Central or South American"; "Other Spanish"; "No, none of these" | | *Measuring America* at 78 |
| *1980* | "Is this person of Spanish/Hispanic origin or descent?" | "No (not Spanish/ Hispanic)"; "Yes, Mexican, Mexican-Amer., Chicano"; "Yes, Puerto Rican"; "Yes, Cuban"; "Yes, other Spanish/Hispanic" | | *Measuring America* at 84 |

| Census Year | Classification/Question | "Hispanic" Responses | Notes | Citation |
|---|---|---|---|---|
| *1990* | "Is this person of Spanish/Hispanic origin?" | Same as 1980, except that "other Spanish/Hispanic" now asked to "Print one group, for example: Argentinean, Colombian, Dominican, Nicaraguan, Salvadoran, Spaniard, and so on." | | *Measuring America* at 91 |
| *2000* | "Is this person Spanish/Hispanic/Latino?" | "No, not Spanish/Hispanic/Latino"; "Yes, Mexican, Mexican Am., Chicano"; "Yes, Puerto Rican"; "Yes, Cuban"; "Yes, other Spanish/Hispanic/Latino—*Print group*" | | *Measuring America* at 100 |

| Census Year | Classification/Question | "Hispanic" Responses | Notes | Citation |
|---|---|---|---|---|
| *2010* | "Is this person of Hispanic, Latino, or Spanish origin?" | "No, not of Hispanic, Latino, or Spanish origin"; "Yes, Mexican, Mexican Am., Chicano"; "Yes, Puerto Rican"; "Yes, Cuban"; "Yes, another Hispanic, Latino, or Spanish origin—*Print origin, for example, Argentinean, Colombian, Dominican, Nicaraguan, Salvadoran, Spaniard, and so on.*" | A new instruction was added: "NOTE: Please answer BOTH Question 5 about Hispanic origin and Question 6 about race. For this census, Hispanic origins are not races." | U.S. Census, *The Hispanic Population: 2010* (2011) |